IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| SEATTLE POWERSPORTS, LLC d/b/a Lawless Harley-Davidson of Renton, a foreign limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>HARLEY-DAVIDSON MOTOR COMPANY, INC., a foreign profit corporation; and HARLEY-DAVIDSON FINANCIAL SERVICES, INC., a foreign profit corporation,<br><br>Defendants. | NO.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Seattle Powersports, LLC d/b/a Lawless Harley-Davidson of Renton ("Renton") by way of Complaint against the Defendants, Harley Davidson Motor Company ("HDMC"), and Harley Davidson Financial Services ("HDFS") hereby alleges as follows:

**Parties**

1. Plaintiff Renton is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 3715 East Valley Road, Renton, Washington.

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

2. Renton is a new motorsports vehicle dealer or "dealer" as defined by Title 46, Chapter 46.93.020(8). From 2013 until 2018 it operated a Harley-Davidson franchised dealership pursuant to a franchise, as defined by Section 46.93.020(4). Renton's Franchise Agreement is attached as **Exhibit A**.

3. Defendant HDMC is a corporation organized and existing under the laws of Wisconsin with its principal place of business located at 3700 West Juneau Avenue, Milwaukee, Wisconsin 53208.

4. HDMC is a manufacturer and distributor, as defined by Sections 46.93.020(6)(a), as it manufactures Harley-Davidson motorcycles and sells, and offers to sell, those motorcycles to dealers (including Renton) in this State and maintains factory representatives.

5. Defendant HDFS is a corporation organized and existing under the laws of Wisconsin with its principal place of business located at 3700 West Juneau Avenue, Milwaukee, Wisconsin 53208.

6. HDFS is a subsidiary of HDMC and provides financing to customers that purchase Harley-Davidson motorcycles as well as dealers that finance their new and used motorcycle inventory.

**Jurisdiction**

7. This court has jurisdiction pursuant to 28 U.S.C. §1332(a)(1) in that there is complete diversity of citizenship and the amount in controversy exceeds the sum of $75,000 exclusive of jurisdiction and costs.

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

8. Venue is proper in this district pursuant to 28 U.S.C. §1391(a) in that jurisdiction is founded solely on the basis of diversity, and HDMC and HDFS, by virtue of their systematic and continuous business contacts in this district, resides in this district.

**Facts Applicable to All Claims**

Renton's Dealership Acquisition

9. In 2013, HDMC encouraged Renton to acquire a dealership in Renton, Washington (in part by arranging for the acquisition funds), which it was having difficulty finding quality ownership for. Renton agreed to acquire the Harley-Davidson dealership that formerly operated in the Renton market and submitted the necessary materials to HDMC to become a Harley-Davidson dealer. HDMC must review and approve any proposed transfer before it becomes effective. HDMC reviewed and approved Renton's proposal, and Renton began operating the Harley-Davidson dealership in December 2013 pursuant to a franchise with HDMC.

10. HDMC required various applications and forms from Renton as part of the dealership acquisition approval process. One of the requirements was for Renton to submit a "pro-forma" business plan that set out Renton's proposed plan of operations at the dealership in great detail including, but not limited to, the sales volume (and associated revenue) for new Harley-Davidson motorcycles once Renton began operating the dealership. HDMC requires a proposed purchaser to submit a "pro-forma" business plan, so that HDMC can review the proposed operations, evaluate the proposed operations, and have a reasonable basis to determine that the operations (as set forth in the pro-forma) would be viable and

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

adequately represent the brand.  Renton provided HDMC the pro-forma during the acquisition review and approval process.

11. The pro-forma business plan was the bedrock of Renton's dealership acquisition proposal as it was the basis upon which Renton would be able to viably operate the dealership.  As referenced above, the pro-forma also detailed the number of new Harley-Davidson motorcycles Renton would need to sell to be profitable in 2014, 2015, 2016, 2017, and 2018.  The pro-forma was based upon receiving a reasonably fair and consistent allocation from HDMC.  Renton projected an increase in new motorcycle sales from approximately 300 new units sold by the prior dealer in 2012 and 2013 to 360 in 2014, 390 in 2015, 420 in 2016, 450 in 2017 and 500 in 2018.  Similarly, Renton provided HDMC with its used motorcycle sales projections.  Renton's pro-forma indicated that it would sell 1.11 new units for every used motorcycle unit sold.

12. In short, Renton's pro-forma constituted the financial basis for its willingness to move forward with the dealership acquisition and reflected the necessary new and used sales to operate the Harley-Davidson franchise viably.  HDMC reviewed Renton's acquisition documents, including the pro-forma, and approved Renton's proposal. Consequently, Renton purchased the dealership for $3,000,000.

13. Concurrent with HDMC's review of Renton's proposed acquisition, HDFS also reviewed Renton's proposal for purposes of considering whether to lend Renton a portion of the purchase price and to extend capital to allow Renton to meet its working capital obligations.  After review of Renton's pro-forma business plan, HDFS agreed to lend Renton the capital needed to acquire the business and also provided a capital loan to provide

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

a portion of Renton's necessary working capital. HDFS financed 80% of the transaction ($2,400,000) and also provided a $300,000 facility improvement loan. Ultimately, HDFS provided financing amounting to 90% of the transaction purchase price.

14. HDFS provides dealership acquisition financing in the normal course of business and has certain limits on the percentage of debt to equity that it will finance in a transaction, which is 80% of the transaction. However, HDFS exceeded its limits in the Renton transaction, meaning that HDFS financed a greater portion of the transaction than it otherwise would have. HDFS expressly approved the proposal, which permitted Renton to operate with a greater debt to equity ratio than other Harley-Davidson dealers. The approvals were based upon Renton's operation of the dealership in line with the projections set forth on its pro-forma business plan.

<u>HDMC's Dealer Agreement with Renton</u>

15. Renton and HDMC operated under a Dealer Agreement, or franchise, that set out the terms and conditions of the parties' relationship.

16. Section A of the Dealer Agreement provides "Purposes and Objectives of this Contract" and states "[t]his contract represents a covenant between Seller and its United States Harley-Davidson dealers to provide current and future Harley-Davidson customers with Harley-Davidson Products and a motorcycling experience that is driven by Harley-Davidson's Purpose and Valued Behaviors.". Those valued behaviors are "be accountable," "model integrity," and "inspire teamwork." In furtherance of its purpose and valued behaviors, HDMC "dedicates itself to the design, engineering, manufacture, marketing and supply of Harley-Davidson Products."

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

17. Section B details the parties' "Sales Efforts". In particular, "Dealer shall devote its best efforts to promote aggressively the sale at retail of Harley-Davidson Products to customers within the Territory assigned to Dealer by Seller". Renton also has a contractual obligation to maintain a certain level of motorcycle inventory:

> "Dealer shall at all times maintain an inventory of current model Harley-Davidson Motorcycles in first class operating condition of a quantity and assortment as are in accordance with such reasonable guidelines as may be established by Seller for Dealer from time to time or <u>which are adequate to meet Dealer's proper share of current and anticipated demand for Harley-Davidson Motorcycles in the Territory</u>."

18. HDMC was also required to provide product requested by Renton:

> FAILURE TO DELIVER. Seller will endeavor, to the extent practicable considering all relevant factors, to produce and deliver to Dealer Harley-Davidson Products and services that are ordered by Dealer and which orders are accepted in writing by Seller, and <u>that are required in the fulfillment of Dealer's responsibilities under this Contract</u>. However, Seller shall not be liable to Dealer in any respect for failure to ship or furnish or for delay in shipment or furnishing of Harley-Davidson Products and services where such failure or delay is due to (a) shortage or curtailment of materials, labor, transportation or utility services, (b) any labor or production difficulty in any of Seller's own or any of its suppliers' or subcontractors' locations, (c) any governmental action, (d) Acts of God or (e) any other cause beyond Seller's reasonable control or without Seller's direct fault or negligence. During any period of shortage of any Harley-Davidson Products or services due to any cause whatsoever, Seller shall have the exclusive right to allocate Harley-Davidson Products and services to Dealer and all other dealers and customers based upon such relevant criteria which Seller may establish in its discretion from time to time, notwithstanding anything herein to the contrary, Such criteria may include, but shall not be limited to, past sales performance by dealers, inventory levels, current and future sales potential of markets, economic forecasts, Seller's operating and strategic plans, government laws and regulations, and/or any other relevant criteria.

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

The contract contains additional detail on Renton's inventory obligations, but in short, the obligations are that which are necessary to meet customer demand. *See Exhibit A.*

19. Renton had many other obligations under the Dealer Agreement including the requirement to maintain a sufficient level of working capital and credit. Specifically, Section J provides that Renton must "provide and maintain at all times sufficient net working capital and floor plan credit lines, the amount which will depend upon the size of Dealer's operations as contemplated by this Contract." Renton's working capital and floorplan credit lines were financed by HDFS based upon Renton's pro-forma business plan.

HDMC Limits New Motorcycle Inventory

20. Following Renton's dealership acquisition, HDMC unilaterally reduced the volume of new motorcycles that it distributed to Renton. HDMC's supply reduction was purportedly due to a weakening new motorcycle sales market overall, but the demand remained strong in Renton's market, and Renton was not supplied with the new motorcycle inventory necessary to meet the demand. Ultimately, HDMC's unilateral supply reductions placed Renton's business in peril to the point that its continued operation was not financially justifiable.

21. Renton's costs to operate the dealership did not decrease as a result of HDMC's supply reductions. It continued to have the responsibility to fund and operate a 40,000 square foot facility which was approved by HDMC to meet its required specifications. Consequently, HDMC placed Renton in a position whereby Renton retained all of its financial obligations to operate the dealership (such as rent, insurance, taxes), but Renton had

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

a smaller supply of product to sell, which directly results in decreased revenue. HDMC placed Renton in an untenable position.

22. HDMC is the sole supplier of new Harley-Davidson motorcycles to its dealers. HDMC decides how many motorcycles to build annually, and HDMC decides how to distribute those motorcycles to its dealers. HDMC creates "retail targets" ("RT") for each of its dealers, which amount to sales goals for those dealers, and HDMC allegedly tries to distribute enough new Harley-Davidson motorcycles to each dealer so that the dealer may achieve its RT sales goal.

23. The entire supply process is dictated by HDMC even though dealers, like Renton, have financial obligations based upon a particular supply level.

24. HDMC's supply of new Harley-Davidson motorcycles to Renton did not come close to the level approved by HDMC in Renton's pro-forma. HDMC's supply of new Harley-Davidson motorcycles to Renton also decreased since Renton was approved as a dealer by HDMC, and the supply level continued to decrease each year. For example, HDMC's sales forecast (RT) for Renton is lower in 2018 than it was in 2017. And, HDMC's RT for Renton in 2017 was lower than in 2016. Rather than allow Renton to build its new unit sales, which is necessary for Renton's survival, HDMC starved Renton of product.

25. HDMC built and distributed additional new Harley-Davidson motorcycles beyond what it supplied to Renton for each year that Renton was in business. And, Renton had consumer demand for additional product than it has sold. Renton repeatedly requested additional new units from HDMC. However, HDMC failed to supply Renton with an adequate number of new Harley-Davidson motorcycles. There was little Renton could do

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

since it is entirely dependent on HDMC to provide the inventory. Ultimately, Renton was forced to sell its dealership as it was unable to sell enough inventory to cover its financial obligations.

26. HDMC's reduction in supply of new motorcycles has been an intentional action. HDMC has sought to lessen motorcycle inventory at its dealerships in an effort to increase the sales prices of new motorcycles and also increase the value of used Harley-Davidson motorcycles.

27. Used Harley-Davidson motorcycles, and the value of those motorcycles, are important to HDMC and HDFS. HDFS loans money to customers to buy motorcycles both new and used. There is always collateral behind the loans, which is almost always the motorcycle that is financed in the transaction. The new motorcycles that are purchased by customers turn into used motorcycles when the customer drives off the lot. However, the loan amount is fixed, subject to the consumer's continuing payment obligation. Thus, more valuable collateral (as opposed to less valuable) is better for the finance company (HDFS). Consequently, limiting the supply of new motorcycles to dealers in an effort to increase the value of used motorcycles was a conscious decision made by HDMC and HDFS that benefits HDFS loan portfolio and benefits HDMC stock price to the detriment of its dealers, such as Renton.

28. HDMC's efforts to reduce new motorcycle supply and increase used motorcycle prices are no secret. In a recent Earnings Conference Call (Q4 2017), HDMC's President and CEO (Matthew Levatich) stated that HDMC has implemented "disciplined

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

supply management" to support "lean and model year mix appropriate year-end retail inventory". Mr. Levatich also noted that HDMC "saw an improvement in used bike prices".

29. HDMC's CFO (John Olin) was even more explicit. Mr. Olin stated that "we remain focused on reducing U.S. retail inventory". Mr. Olin also stated that he expects inventories to remain down in 2018 "as we continue to keep pressure on the overall system and keep inventories lower." Mr. Olin further stated that HDMC wants dealers to sell used motorcycles, and HDMC's efforts "put upward pressure on used bike pricing".

30. HDMC's actions were intentional efforts to reduce the available supply of product to Renton, regardless of its demand for new product, which damaged Renton each month of its operation by not allowing Renton the adequate supply of new motorcycles needed to operate its dealership business.

31. However, HDMC was willing to provide Renton additional inventory upon one condition: Renton would have to sell its units for a higher price. The HDMC regional manager for Renton's territory communicated to Renton that if it charged the customers more for a sale, it could possibly earn more inventory. Otherwise, HDMC advised Renton to "cherish its inventory." Indeed, HDMC's dealership performance criteria included the sale price of the unit, with the higher the price being more favorable. That pricing component was recently removed from HDMC's performance measurement.

<u>HDMC'S Inventory Practices Harm Renton</u>

32. Renton was unable to obtain an adequate number of new Harley-Davidson motorcycles to meet customer demand in its market or to meet the level of sales necessary to support its financial obligations at its dealership. For example, Renton's pro-forma, which

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

HDMC's approval was based upon and HDFS' lending was based upon, shows that Renton expected to sell 420 new motorcycles in 2016 and 450 in 2017. Yet, HDMC unilaterally reduced Renton's RT sales goal to 307 in 2016 and 290 in 2017. Even worse, HDMC provided even fewer motorcycles to Renton in those years. For example, HDMC only provided Renton with 295 Harley-Davidson motorcycles in 2016 and 288 in 2017. Renton's 2018 forecast (286 units) continued to decrease and remains significantly lower than what was projected for Renton when Renton purchased the dealership. HDMC's unilaterally imposed RT sales goal and inventory levels do not support Renton's investment or consumer demand in the market.

33. Concurrent with HDMC's inventory reductions, HDMC unilaterally altered Renton's assigned Territory. Each dealer has an assigned Territory, which is the area that is closer to that dealer than any other Harley-Davidson dealer. The assigned Territory is not exclusive, meaning that other dealers may sell within that area, but it is important as it is part of HDMC's determination for the dealer's Retail Target sales goals. The more customers that reside in the Territory, the higher the sales goals and the higher the supply of inventory to the dealer to meet the sales goals. Similarly, a smaller Territory will lead to a smaller RT and lower levels of inventory.

34. HDMC removed certain zip-codes from Renton's Territory following the relocation of another dealer in the market and provided that territory to the relocating dealer. There was no reasonable basis upon which to reassign the zip-codes. The reassignment of the zip-codes removed customers from Renton's Territory and correspondingly reduced its RT, which simultaneously increased the other dealer's Territory. Thereafter, Renton received

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

less inventory from HDMC. HDMC unreasonably reduced Renton's Territory and provided it to the relocating dealer. Renton purchased the dealership based upon a certain territory, and nothing changed that would support a change in the territory.

35. Renton made a substantial investment in the franchise and in the facility based upon a certain level of inventory. There is no need for a 40,000 square foot facility that is extensively appointed to Harley-Davidson's specifications if Renton would not receive a sufficient level of new motorcycle inventory. Simply put, Renton could have operated as a glorified used motorcycle dealer without the massive investment it made in the Renton dealership, but in order to operate the Renton dealership (and all the expenses that necessarily accompany such), Renton needed adequate inventory.

36. As a result of the decreasing inventory, Renton was forced to invest additional outside capital to keep it in compliance with HDMC's net working capital requirements.

37. On November 13, 2018, Renton sold its dealership franchise to a third-party as it could no longer financially justify its operation. Directly as a result of HDMC's actions Renton suffered damages when the franchise was sold for significantly less than it would have had Renton been provided with its promised inventory. HDMC knew, or reasonably should have known, that the loss of value in the franchise would occur when it acted to decrease Renton's inventory.

38. As evidence that HDMC was fully able to provide additional inventory to Renton in order to meet its customer demand, HDMC provided nearly 300 additional Harley-

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

Davidson motorcycles to the party who purchased Renton's franchise in 2018. HDMC could have provided additional inventory to Renton while it was operating, but it did not.

**Count I (Breach of Contract- Section A-C)**

39. Renton realleges and incorporates paragraphs 1-38 as set forth fully herein.

40. Renton and HDMC were parties to a franchise. Section A of the franchise provides that the "Contract represents a covenant between Seller [HDMC] and its United States Harley-Davidson dealers". Section A continues by listing the Purpose and Valued Behaviors that the Parties will abide by, which include to "be accountable," "model integrity," and "inspire teamwork." ". Additionally, HDMC "dedicates itself to the design, engineering, manufacturer, marketing and supply of Harley-Davidson Products and services designed to achieve this purpose and to reflect these valued behaviors." *Exhibit A.* Section B includes the requirement that dealer (Renton) "shall at all times maintain an inventory of current model Harley-Davidson Motorcycles … which are adequate to meet Dealer's proper share of current and anticipated demand for Harley-Davidson Motorcycles in the Territory." *Id*. Section C is entitled "Failure to Deliver" and imposes an obligation on HDMC to deliver to Renton requested by Renton in quantities "that are required in the fulfillment of Dealer's responsibilities under this Contract." *Id*. In conjunction, the provisions make clear that both parties (Renton and HDMC) will work together to meet consumer demand through HDMC's supply, and Renton's sale, of the product. However, HDMC did not provide the supply.

41. HDMC approved Renton as a Harley-Davidson dealer and in so doing, reviewed Renton's plan of operations as set forth in its pro forma. HDMC unilaterally reduced Renton's supply of new Harley-Davidson motorcycles to a level substantially below

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

what is necessary for Renton to operate its business, and to a level substantially below what Renton proposed to HDMC for the transaction. The level was below the demand in Renton's territory, and that which Renton needed to maintain to comply with the agreement.

42. HDMC breached its obligation to provide a supply of Harley-Davidson Products that would allow Renton to achieve the purpose and mission set forth under the agreement. Instead, HDMC's unilateral inventory supply reductions placed Renton's ability to operate untenable.

43. HDMC's actions damaged Renton as Renton did not have the supply of new vehicles necessary to meet customer demand or to meet its financial obligations in operating the Renton dealership, which HDMC was aware of prior to authorizing Renton as a franchised Harley-Davidson dealer. HDMC's actions also damaged Renton as Renton suffered loss in the value of its franchise.

**Count II (Breach of Contract)**

44. Renton realleges and incorporates paragraphs 1-43 as if set forth fully herein.

45. Section J(4) of the franchise imposes an obligation for Renton to "at all times maintain sufficient net working capital and floor plan credit lines" in the operation of its business. The working capital and floor plan credit line amounts are established by HDMC in its sole discretion.

46. HDMC was required under the agreement to produce and deliver to Renton Harley-Davidson Products and services that were ordered by Renton and that were required in the fulfillment of Dealer's responsibilities under the contract. *See Exhibit A.*

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

47. Renton's business operations were based upon the ability to sell a certain level of new Harley-Davidson motorcycles. Renton's cash flow depended upon the revenue that comes from the sale of new Harley-Davidson motorcycles. The necessary total new unit sales and the revenue flowing from those sales was presented directly to HDMC prior to HDMC approving Renton to purchase the dealership and authorizing Renton as a Harley-Davidson dealer.

48. HDMC's subsequent reduction in supply of new motorcycles to Renton directly impacted Renton's ability to comply with Section J(4) of the franchise. Specifically, Renton's ability to maintain working capital is diminished as the working capital is being used to fund the actual dealership operations due to HDMC unilaterally limiting the supply of new motorcycles that would have generated revenue for Renton.

49. HDMC's actions have damaged Renton through the reduction of revenue and lost profits and also by placing Renton's franchise operations in jeopardy due to the inability to meet the capital and floor plan credit requirements to the point it was necessary to sell its franchise. HDMC's actions also damaged Renton when its reductions caused a loss to the value of the franchise which Renton suffered when it sold the dealership.

**Count III (Breach of Duty of Good Faith and Fair Dealing)**

50. Renton realleges and incorporates paragraphs 1-49 as set forth fully herein.

51. Washington law implies a duty of good faith and fair dealing in all contracts between parties entered into in the State. *See Rekhter v. State, Dept. of Social and Health, 180 Wash.2d 102 (2014).*

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

52. In particular, the duty of good faith and fair dealing arises when the contract gives one party discretionary authority to determine a contract term. *Id.*

53. Section A of the franchise provides that HDMC "dedicates itself to the …. supply of Harley-Davidson Products and services designed to achieve this purpose." In contracting to supply Renton with products as a Harley-Davidson dealer, HDMC reviewed Renton's plan of operations as set forth in its pro forma and at no time expressed that it could not meet the supply levels contained in the approved pro-forma. *See Exhibit A.*

54. Despite is approval of the proposed pro-forma and agreement to supply product, HDMC unilaterally reduced Renton's supply of new Harley-Davidson motorcycles to a level substantially below what is necessary for Renton to operate its business. HDMC's decision was made purely in an effort to accomplish its own interest, to the detriment of Renton, and was not done in good faith or fairly as it pertains to its contractual duties owed to Renton.

55. As a result of the actions of defendants, set forth herein above, the defendants have violated the implied duty of good faith and fair dealing in reference to its franchise with Renton.

56. HDMC's actions have damaged Renton through the reduction of revenue and lost profits and also by placing Renton's franchise operations in jeopardy due to the inability to meet the capital and floor plan credit requirements to the point it was necessary to sell its franchise. HDMC's actions also damaged Renton when its reductions caused a loss to the value of the franchise which Renton suffered when it sold the dealership.

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

**Count IV (Violation of §46.93.170(1)(d))**

57. Renton realleges and incorporates paragraphs 1-56 as set forth fully herein.

58. Washington Code Section 46.93.170(1)(d) makes it unlawful for a manufacturer to "[d]iscriminate between dealers by adopting a method, or changing an existing method, for the allocation, scheduling, or delivery of new motorsports vehicles, parts, or accessories to its dealers that is not fair, reasonable, and equitable."

59. HDMC adopted a method for the allocation and/or delivery of its motorcycles that was not fair, reasonable and equitable. Specifically, HDMC unilaterally reduced the allocation and/or delivery of motorcycles to Renton year after year notwithstanding that Renton's Harley-Davidson dealership operations was dependent upon a supply of new Harley-Davidson motorcycles in much greater numbers than HDMC delivered.

60. HDMC was aware of Renton's new motorcycle supply needs, and Renton has repeatedly requested additional units from HDMC. HDMC's methods were not based upon Renton's dealership needs, but instead, upon HDMC's unilateral desire to limit supply to all of its dealers and simultaneous try to inflate the prices of used Harley-Davidson motorcycles.

61. HDMC's actions were not fair to Renton, not reasonable to Renton and not equitable to Renton especially in light of the fact that HDMC was keenly aware of Renton's proposals and needs for the marketplace when it purchased the dealership just a few years ago. HDMC's actions have damaged Renton by depriving Renton of a supply of new Harley-Davidson motorcycles that is fair, reasonable and equitable, and specifically, would allow Renton to meet consumer demand and achieve the level that it bargained for when it purchased the dealership with HDMC's approval, ultimately, resulting in Renton's need to

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

sell its franchise. HDMC's actions also damaged Renton when its reductions caused a loss to the value of the franchise which Renton suffered when it sold the dealership.

**Count V (Violation of §46.93.170(1)(e))**

62. Renton realleges and incorporates paragraphs 1-61 as set forth fully herein.

63. Washington Code Section 46.93.170(1)(e) prohibits HDMC from failing to deliver reasonable quantities of new motorcycles to a dealer if motorcycles are being provided to other dealers in the State. This provision prohibits favoring one dealer over another, or providing sufficient quantities of product to one dealer, but not another.

64. HDMC failed to provide reasonable quantities of new Harley-Davidson motorcycles to Renton from 2014 to 2018. Renton repeatedly requested that HDMC provide additional motorcycles. HDMC has provided reasonable quantities of new Harley-Davidson motorcycles to other dealers in the State, and there is no dispute that HDMC had additional motorcycles that it could have provided Renton. Indeed, HDMC stated that additional units were available on limited circumstances and it is believed that HDMC provided over hundreds of additional motorcycles to the party who purchased the Renton franchise after they took control.

65. HDMC's actions directly violated Section 46.93.170(1)(e) and have harmed Renton. Additionally, HDMC's actions deprived Renton of reasonable quantities of new motorcycle inventory and the resultant sales that would accompany those units. HDMC's actions also damaged Renton when its reductions caused a loss to the value of the franchise which Renton suffered when it sold the dealership.

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

**Count VI (Unlawful and Unfair Practices – 19.86 RCW)**

66. Renton realleges and incorporates paragraphs 1-65 as set forth fully herein.

67. Washington Code Section 46.93.170(4) provides that a violation of Section 46.93.170 "is deemed to affect the public interest and constitutes an unlawful and unfair practice under chapter 19.86 RCW."

68. HDMC's actions set forth in Counts IV and V are prima facie unlawful and unfair practices under 19.86 RCW as provided by Section 46.93.170(4).

69. HDMC's unlawful and unfair practices constitute a violation of Washington's Consumer Protection Act (19.86 RCW). Renton accordingly seeks to recover damages, treble damages, attorney's fees, costs, and any other relief available under 46.93.170 RCW and 19.86.090 RCW resulting from HDMC's unlawful and unfair practices.

**Count VII (Unlawful and Unfair Practices Against HDMC and HDFS – 19.86 RCW)**

70. Renton realleges and incorporates paragraphs 1-69 as set forth fully herein.

71. HDMC and HDFS had contractual relationships with Renton relating to Renton's operation of a motorcycle dealership. HDMC is the manufacturer and distributor of new Harley-Davidson motorcycles, and HDFS is HDMC's wholly owned subsidiary that provides financial services to consumers and dealers. Both HDMC and HDFS conduct trade with Renton.

72. The legislature made detailed findings about the role of motorsports dealerships in the state. Specifically, the legislature has determined that

> the distribution and sale of motorsports vehicles in this state vitally affect the general economy of the state and the public interest and public welfare, that

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

> provision for warranty service to motorsports vehicles is of substantial concern to the people of this state, that the maintenance of fair competition among dealers and others is in the public interest, and that the maintenance of strong and sound dealerships is essential to provide continuing and necessary reliable services to the consuming public in this state and to provide stable employment to the citizens of this state.

Furthermore,

> [t]he legislature recognizes it is in the best interest for manufacturers and dealers of motorsports vehicles to conduct business with each other in a fair, efficient, and competitive manner. The legislature declares the public interest is best served by dealers being assured of the ability to manage their business enterprises under a contractual obligation with manufacturers where dealers do not experience unreasonable interference and are assured of the ability to transfer ownership of their business without undue constraints. It is the intent of the legislature to impose a regulatory scheme and to regulate competition in the motorsports vehicle industry to the extent necessary to balance fairness and efficiency. These actions will permit motorsports vehicle dealers to better serve consumers and allow dealers to devote their best competitive efforts and resources to the sale and services of the manufacturer's products to consumers.

73. HDMC intentionally reduced its supply of new Harley-Davidson motorcycles to Renton notwithstanding Renton’s investments based upon a certain level of inventory and repeated requests for same. HDMC’s actions threatened Renton’s viability, which impacted the public as set forth above. Moreover, HDMC’s unilateral actions were unfair and deprived Renton of the ability to manage its business that it bargained for, which was approved by HDMC.

74. HDMC’s unilateral actions were designed to benefit HDFS. HDMC has an interest as well since HDFS is a subsidiary of HDMC, and HDMC is a publicly traded entity that must report its financial performance. Specifically, HDFS finances many new and used

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

Harley-Davidson motorcycle purchases. The collateral for those purchases are the motorcycles. HDFS has a distinct interest in increasing used motorcycle values, as those values are directly reflected as collateral of HDFS. Simply put, HDMC purposefully limited supply of new motorcycles to Renton in an effort to increase used motorcycle prices. This was a unilateral decision by HDMC that has a corresponding benefit to HDFS, and harms Renton.

75. HDMC and HDFS actions were unilateral and imposed upon Renton. HDMC and HDFS actions are unfair and deceptive. Specifically, both parties were aware that Renton bargained for its dealership based upon a fair and consistent supply of motorcycles and invested $3,000,000 based upon the ability to receive such a supply of new Harley-Davidson motorcycles, and subsequently invested more when HDMC failed to deliver the necessary required inventory. This was plainly illustrated by Renton's pro-forma. HDMC is the sole supplier of such product. HDMC and HDFS took intentional action contrary to Renton's interests and did not inform Renton that it would take such action. Moreover, HDMC and HDFS actions continued after Renton's repeated requests for additional inventory that was vital to its operations.

76. HDMC and HDFS actions are designed to directly benefit HDMC and HDFS while they harm Renton, specifically, by starving Renton of the product that it needed to operate a viable business. HDMC had product available that it could have supplied Renton, but it had repeatedly failed to do so. Similarly, HDFS stopped lending funds to Renton as a result of the cash flow shortage, which HDFS is otherwise complicit in and a direct beneficiary of.

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

77. HDMC and HDFS caused Renton damage as a result of their scheme to limit the supply of new Harley-Davidson product in order to boost the value of used Harley-Davidson motorcycles. Specifically, Renton did not receive the number of new units necessary to meet consumer demand or meet its financial obligations, which were known to HDMC and HDFS prior to their respective approvals of the Renton dealership acquisition, and suffered substantial damages. HDMC and HDFS's actions also damaged Renton when its reductions caused a loss to the value of the franchise which Renton suffered when it sold the dealership.

78. HDMC and HDFS' actions were unfair, deceptive, unlawful, and not done in good faith, in violation of the Washington Consumer Protection Act, 19.86.020 RCW. Accordingly, Renton seeks to recover damages, treble damages, attorney's fees and costs resulting from HDMC and HDFS' unlawful and unfair practice based on 19.86.090 RCW.

79. The damages that have been and will be caused to Renton as a result of these actions are greater than $75,000.00.

**Count VIII (Promissory Estoppel)**

80. Renton realleges and incorporates paragraphs 1-79 as set forth fully herein.

81. In approaching Renton to purchase its franchise and entering into its agreement with Renton, HDMC promised to reasonably supply Renton with inventory necessary to meet the requirements of its contract.

82. HDMC knew, or should have known, that Renton would rely on this promise as evidenced by the pro-forma and other operations forecast which HDMC reviewed and approved when agreeing to Renton's purchase of the franchise.

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

83. Renton invested substantial monies to purchase and operate its Harley-Davidson dealership in reliance on HDMC's promise.

84. However, HDMC, for its own financial benefit, intentionally failed to provide Renton with inventory consistent with its prior promise causing Renton to fail to meet the financial obligations it had committed to.

85. HDMC caused Renton damages as a result of its failed promise to provide Renton with necessary inventory. HDMC's actions also damaged Renton when its reductions caused a loss to the value of the franchise which Renton suffered when it sold the dealership.

WHEREFORE, Renton demands a jury trial on all issues so triable and entry of a judgment against HDMC and HDFS:

(i) finding that HDMC has breached the franchise agreement;

(ii) finding that HDMC has breached its duty of good faith and fair dealing;

(ii) finding that HDMC has violated Washington Statute Section 46.93.170(1)(d);

(iii) finding that HDMC has violated Washington Statute Section 46.93.170(1)(e);

(iv) finding that HDMC and HDFS have committed an unlawful and unfair trade practice under 19.86 RCW;

(v) finding that HDMC is estopped from avoiding responsibility for the damages caused by its breach of the franchise agreement; and

(iv) awarding Renton its damages as well as attorney's fees, costs, and treble damages.

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

**DATED** this 23rd day of August, 2019.

**DAVIES PEARSON, P.C.**

*/s/ Brian M. King*
BRIAN M. KING, WSB #29197
920 Fawcett Avenue / P.O. Box 1657
Tacoma, WA 98401
Telephone: (253) 620-1500
Email: bking@dpearson.com;
jwaterman@dpearson.com

**BASS SOX MERCER**

*/s/ Jason T. Allen*
Jason T. Allen, FBN 25659
Micah A. Andrews, FBN 117592
2822 Remington Green Circle
Tallahassee, Florida 32308
Telephone: (850) 878-6404
Email: jallen@dealerlawyer.com;
mandrews@dealerlawyer.com;
sstrickler@dealerlawyer.com
*Attorneys for Plaintiff*

*Pro Hac Vice Application filed concurrently*

**COMPLAINT AND DEMAND FOR JURY TRIAL**
Page 24 of 24
jw / s:\2xxxx\25xxx\256xx\25676\1 - v. hdmc\pldgs\2019-08-23 complaint.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

Case 2:20-cv-00311-LA Filed 08/23/19 Page 24 of 49 Document 1

# HARLEY-DAVIDSON MOTOR COMPANY

## GENERAL CONDITIONS OF SALES AND SERVICE

January 2015

## TABLE OF CONTENTS

A. PURPOSES AND OBJECTIVES OF THIS CONTRACT .......... 1

B. SALES EFFORTS .......... 1

1. MOTORCYCLE SALES .......... 2
2. MOTORCYCLE INVENTORY AND DEMONSTRATORS .......... 2
3. PARTS AND ACCESSORIES AND MOTORCLOTHES PRODUCT SALES .......... 2
4. PARTS AND ACCESSORIES AND MOTORCLOTHES PRODUCT INVENTORIES .......... 2
5. POLICE SALES .......... 2
6. NON-RETAIL SALES .......... 2

C. ORDERS AND TERMS OF SALE .......... 3

1. INITIAL MOTORCYCLE ORDER .......... 3
2. BASIC MOTORCYCLE ORDER .......... 3
3. SPECIAL EQUIPMENT .......... 4
4. DELIVERY AND TITLE .......... 4
5. DESTINATION CHARGES AND DIVERSION .......... 4
6. FAILURE TO DELIVER .......... 4

D. PRICES AND PAYMENT .......... 5

1. PRICES .......... 5
2. PAYMENT .......... 5
3. DELINQUENCY .......... 5

E. FACILITIES .......... 5

1. LOCATION AND USE .......... 5
2. IDENTIFICATION .......... 5
3. HOURS OF OPERATION .......... 6
4. SELLER ASSISTANCE .......... 6

F. SERVICE .......... 6

1. SERVICE ORGANIZATION .......... 6
2. PRE-DELIVERY OBLIGATIONS .......... 6
3. PRODUCT WARRANTY .......... 7
4. WARRANTY AND RECALL SERVICE .......... 7
5. CLAIMS .......... 7
6. PRODUCT MODIFICATIONS .......... 8
7. SALES AND WARRANTY REGISTRATION FORM .......... 8

G. TRAINING .......... 8

H. CUSTOMER SATISFACTION AND EXPERIENCE .......... 9

I. ADVERTISING .......... 9

1. DEALER RESPONSIBILITIES .......... 9
2. SELLER ASSISTANCE .......... 9
3. DIRECT MAIL .......... 9
4. PROHIBITED PRACTICES .......... 9

J. OTHER RESPONSIBILITIES .......... 10

1. FINANCIAL REPORTING .......... 10
2. OTHER REPORTS AND DATA .......... 10

3. COMPLIANCE WITH LAWS ....... 10
4. CAPITAL AND CREDIT REQUIREMENTS ....... 10
5. INSURANCE ....... 10
6. INSPECTIONS ....... 11
7. DATA TRANSMISSION SYSTEMS ....... 11
8. CONFIDENTIALITY ....... 11

K. TRADEMARKS ....... 11

1. OWNERSHIP ....... 11
2. DISPLAY ....... 12
3. REPRESENTATION AS TO PRODUCTS ....... 12
4. CONSENT TO USE SELLER'S TRADEMARKS ....... 13
5. ENFORCEMENT ....... 13
6. DEALER ....... 13
7. DOMAIN NAMES ....... 13

L. CHANGES IN DEALER OPERATOR OR OWNERSHIP ....... 14

1. APPROVAL BY SELLER ....... 14
2. DEATH OR INCAPACITY OF DEALER OPERATOR OR OWNER ....... 14
3. SUCCESSION PLAN ....... 15
4. RIGHT OF FIRST REFUSAL ....... 16

M. TERMINATION ....... 16

1. AUTOMATICALLY ON DEATH OR INCAPACITY ....... 16
2. BY DEALER ....... 16
3. BY EITHER PARTY ....... 16
4. BY SELLER ....... 17
5. DEALER'S FAILURE TO PERFORM SALES, SERVICE AND FACILITIES RESPONSIBILITIES ....... 17
6. DEALER'S FAILURE TO PERFORM OTHER RESPONSIBILITIES ....... 17
7. RESPONSIBILITIES FOLLOWING TERMINATION ....... 18
8. SUBSEQUENT RELATIONS ....... 18

N. TERMINATION OF SPECIAL MARKET RIGHTS ....... 19

O. DISPUTE RESOLUTION PROCESS ....... 19

1. OPTIONAL REMEDY ....... 19
2. MEDIATION ....... 19
3. BINDING ARBITRATION ....... 19

P. MISCELLANEOUS ....... 19

1. NOT AGENCY ....... 19
2. PRODUCT AND DESIGN MATTERS ....... 20
3. DEALER RESTAURANTS ....... 20
4. TERMINATION OF BUELL SERVICE AGREEMENT ....... 20
5. NOTICES ....... 20
6. ACKNOWLEDGMENTS ....... 21
7. WAIVER ....... 21
8. ENTIRE CONTRACT ....... 21
9. AMENDMENT ....... 21
10. GOVERNING LAW ....... 21
11. SEVERABILITY ....... 21
12. ASSIGNABILITY ....... 21
13. HEADINGS ....... 21
14. PROTECTION OF CONSUMER DATA ....... 22

# HARLEY-DAVIDSON MOTOR COMPANY

# GENERAL CONDITIONS OF SALES AND SERVICE

## A.  PURPOSES AND OBJECTIVES OF THIS CONTRACT

This Contract represents a covenant between Seller and its United States Harley-Davidson dealers to provide current and future Harley-Davidson customers with Harley-Davidson Products and a motorcycling experience that is driven by Harley-Davidson's Purpose and Valued Behaviors:

**Purpose**:
Harley-Davidson fulfills dreams of personal freedom for people around the world. This has been our bold and unique purpose since 1903. We give people the means to express themselves; the means to liberate themselves from whatever constrains them.

**Valued Behaviors**:
- Be Accountable
- Model Integrity
- Value Individuality and Diversity
- Inspire Teamwork
- Encourage Creativity

To that end, Seller dedicates itself to the design, engineering, manufacture, marketing and supply of Harley-Davidson Products and services designed to achieve this purpose and to reflect these valued behaviors. Similarly, Dealer dedicates itself to serving the Harley-Davidson customer and ensuring that Harley-Davidson Products are sold and serviced in a manner that promotes the Harley-Davidson experience while increasing customer confidence and customer satisfaction.

Dealer and Seller in our mutual interest, will each maintain learning organizations, fully trained and with support systems necessary to maintain the finest customer service organization in the industry.

## B.  SALES EFFORTS

Seller will assign Dealer a geographic area from time to time as Dealer's Territory, in which Dealer is responsible for effectively selling at retail, servicing and otherwise representing Harley-Davidson Products.  It is understood and agreed that (a) Seller may modify, alter or adjust Dealer's Territory at any time, based on Seller's good faith business judgment; and (b) Dealer's Territory is non-exclusive.  Without limitation, Dealer recognizes that Seller may change its Territory if the change results from the establishment of an additional Harley-Davidson dealership, the removal of an existing dealership, or the relocation of an existing dealership.

Dealer shall devote its best efforts to promote aggressively the sale at retail of Harley-Davidson Products to customers within the Territory assigned to Dealer by Seller from time to time.  To accomplish this, Dealer shall develop, maintain and direct a competent sales organization for Harley-Davidson Products and shall conduct throughout each model year aggressive Harley-Davidson Product advertising and sales promotion activities, making use, to the greatest reasonable extent, of the advertising and sales promotion programs Seller may offer from time to time.

**1. MOTORCYCLE SALES.** Dealer agrees to cooperate with Seller in reviewing and planning Dealer's Harley-Davidson Motorcycle promotion and sales effort throughout each model year and further agrees to meet such Harley-Davidson Motorcycle sales objectives based upon market shares and other relevant criteria that Seller may reasonably establish for Dealer from time to time and which take into account Harley-Davidson Motorcycle availability.

**2. MOTORCYCLE INVENTORY AND DEMONSTRATORS.** Subject to availability from Seller, Dealer shall at all times maintain an inventory of current model Harley-Davidson Motorcycles in first class operating condition of a quantity and assortment as are in accordance with such reasonable guidelines as may be established by Seller for Dealer from time to time or which are adequate to meet Dealer's proper share of current and anticipated demand for Harley-Davidson Motorcycles in the Territory. Dealer understands that Seller may adopt and utilize sales and inventory management programs to allow Dealer and Seller to forecast Dealer's expected requirements for Harley-Davidson Motorcycles so as to enable Dealer to meet anticipated customer demand. Dealer shall cooperate with Seller in the implementation and operation of such programs throughout the model year in order to maximize the effectiveness of such programs. As part of its responsibility for maintaining an adequate inventory of Harley-Davidson Motorcycles, Dealer agrees based on availability to maintain and display in first class operating condition demonstrator Harley-Davidson Motorcycles consisting of a minimum of one from each of Seller's current families. Dealer shall maintain an effective system of motorcycle inventory control that complies with the requirements established by Seller from time to time.

**3. PARTS AND ACCESSORIES AND MOTORCLOTHES® PRODUCT SALES.** Dealer agrees to cooperate with Seller in reviewing and planning Dealer's Parts and Accessories and MotorClothes® product promotion and sales effort throughout each model year and further agrees to meet such Parts and Accessories and MotorClothes® product sales objectives as Seller may reasonably establish from time to time.

**4. PARTS AND ACCESSORIES AND MOTORCLOTHES® PRODUCT INVENTORIES.** Subject to availability from Seller, Dealer shall at all times maintain an inventory of Parts and Accessories and MotorClothes® product of a quantity and assortment as are in accordance with such reasonable guidelines as may be established by Seller for Dealer from time to time to meet current and anticipated customer demand in the Territory and to fulfill Dealer's obligations for performing warranty, recall and other services pursuant to this Contract. Dealer shall maintain an effective system of inventory control and Seller agrees to provide Dealer reasonable assistance at Dealer's request to establish an effective system of inventory control.

**5. POLICE SALES.** Dealer shall promote the sales of Harley-Davidson Motorcycles to law enforcement agencies and fraternal groups within the Territory. Dealer agrees to furnish Seller from time to time with a written report concerning Dealer's sales activities under this paragraph within thirty (30) days of Seller's written request. Dealer agrees based on availability to maintain a current police demonstrator Harley-Davidson Motorcycle as may be reasonably recommended by Seller.

**6. NON-RETAIL SALES.** In order to ensure customer satisfaction and safety, facilitate compliance with federal and state law and laws in various foreign countries, foster reasonable competition, address local market needs, and protect the integrity of the Harley-Davidson distribution network, Dealer is authorized to sell and service Harley-Davidson Products only for delivery from the Dealer Location and Dealer shall not sell Harley-Davidson Products for resale to non-retail customers, except to other United States authorized Harley-Davidson dealers in accordance with Seller's written policies. Non-retail customers include customers who purchase Harley-Davidson Products for resale, customers who reside outside of the United

Case 2:20-cv-00311-LA Filed 08/23/19 Page 29 of 49 Document 1

States, and customers who purchase Harley-Davidson Products for shipment or use outside of the United States. Dealer shall not sell new Harley-Davidson Motorcycles through any Internet web site or otherwise in e-commerce. Seller reserves the right to establish from time to time such policies and position statements it believes are necessary or advisable to carry out the purpose or intent of this part of this Contract and Dealer shall comply with all such policies and position statements.

## C. ORDERS AND TERMS OF SALE

Dealer shall submit orders for Harley-Davidson Products to Seller in such quantity and assortment as are necessary to fulfill Dealer's responsibilities under this Contract. All orders shall be submitted in such manner as required by Seller and shall be subject to acceptance in whole or in part by Seller at Milwaukee, Wisconsin. However, Dealer understands and agrees that Seller will not accept orders from Dealer for a specific retail customer. All orders for Harley-Davidson Products and services shall be subject to and governed exclusively by this Contract and any supplemental written terms and conditions of sale published by Seller from time to time for its dealers. This Contract and any supplemental terms and conditions of sale from Seller shall be the exclusive governing document, notwithstanding any different, new or additional terms and conditions set forth in Dealer's orders or other sales proposals. Any order for Harley-Davidson Products not shipped during the month for which delivery was scheduled or acknowledged by Seller will remain in effect unless canceled by Dealer pursuant to Seller's written procedures then in effect or unless canceled or changed by Seller in whole or in part upon written notice to Dealer.

**1. INITIAL MOTORCYCLE ORDER.** In recognition of Seller's and Dealer's need to have new model Harley-Davidson Motorcycles available for display and sale to Dealer's customers as soon as possible, Seller from time to time may enter an initial order on Dealer's behalf for any new Harley-Davidson Motorcycle models to be offered to Dealer by Seller (referred to in this Contract as an "Initial Order"). The quantity and assortment of such new Harley-Davidson Motorcycle models comprising Dealer's Initial Order shall be as determined by Seller, based upon its reasonable judgment. Nevertheless, Seller agrees to notify Dealer of its Initial Order and provide Dealer a reasonable period prior to shipment to cancel motorcycle units in its Initial Order or to revise its Initial Order within Seller's guidelines. Except for its motorcycle unit cancellations, any other revisions by Dealer to its Initial Order shall be subject to Seller's acceptance. Following the expiration of said reasonable period, Dealer's original or revised accepted Initial Order, as the case may be, will be considered firm and shipped to Dealer.

**2. BASIC MOTORCYCLE ORDER.** To enable Seller to plan for, establish and carry out Harley-Davidson Motorcycle production schedules effectively throughout each model year, Dealer shall, upon Seller's written request and pursuant to Seller's procedures then in effect, furnish Seller at the commencement of each model year a basic order for Harley-Davidson Motorcycles (referred to in this Contract as a "Basic Order"). The Basic Order shall be based upon Dealer's best estimate, in consultation with Seller, of Dealer's entire new Harley-Davidson Motorcycle needs for said model year. Seller shall determine the monthly quantities of Harley-Davidson Motorcycles offered to Dealer in various order phases throughout the model year to be applied against the Basic Order. Dealer agrees to amend its Basic Order, in consultation with Seller, so as to make prompt and adequate provision for any new model Harley-Davidson Motorcycles which may be introduced by Seller and offered for sale to Dealer following the commencement of the model year. All Harley-Davidson Motorcycle orders whatsoever submitted in writing by Dealer to Seller shall remain in effect unless canceled or changed by Dealer in whole or in part pursuant to Seller's written cancellation or change order procedures then in effect or unless canceled or changed by Seller in whole or in part upon notice to Dealer.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 30 of 49 Document 1

**3. SPECIAL EQUIPMENT.** Seller is authorized to have installed on any Harley-Davidson Motorcycle ordered by Dealer any equipment or accessory required by any applicable federal, state or local law, rule or regulation. Dealer shall be entirely responsible for any consequences imposed by law in the event Dealer removes or tampers with any such equipment or accessory.

**4. DELIVERY AND TITLE.** It is agreed and understood that delivery of any Harley-Davidson Products shipped to Dealer shall be made to Dealer at the Harley-Davidson factory from which such Harley-Davidson Products are shipped or, if shipped from a place other than the factory, at place of shipment, and title and risk of loss to the Harley-Davidson Products shall pass to Dealer at that time. In the event of a C.O.D. shipment, the place of delivery shall be deemed to be the factory or other place of shipment and the carrier shall be deemed to be Seller's agent only for the purpose of making collection; title and risk of loss to the Harley-Davidson Products shall be deemed to pass to Dealer at the factory or other place of shipment subject only to the lien of Seller for the purchase price and charges reserved by C.O.D. shipments.

**5. DESTINATION CHARGES AND DIVERSION.** Dealer shall be responsible for and pay any and all storage, demurrage and other charges accruing after arrival of any shipment to Dealer at its destination. In the event Seller is required to divert Harley-Davidson Products ordered by Dealer because of Dealer's failure or refusal to accept delivery of such Harley-Davidson Products, Dealer shall be responsible for and pay the entire cost and expense resulting from such diversion, including but not limited to any transportation charges to and from Dealer's place of business, unless such failure or refusal by Dealer is without the fault or negligence of Dealer.

**6. FAILURE TO DELIVER.** Seller will endeavor, to the extent practicable considering all relevant factors, to produce and deliver to Dealer Harley-Davidson Products and services that are ordered by Dealer and which orders are accepted by Seller, and that are required in the fulfillment of Dealer's responsibilities under this Contract. However, Seller shall not be liable to Dealer in any respect for failure to ship or furnish or for delay in shipment or furnishing of Harley-Davidson Products and services where such failure or delay is due to (a) shortage or curtailment of materials, labor, transportation or utility services, (b) any labor or production difficulty in any of Seller's own or any of its suppliers' or subcontractors' locations, (c) any governmental action, (d) Acts of God or (e) any other cause beyond Seller's reasonable control or without Seller's direct fault or negligence. During any period of shortage of any Harley-Davidson Products or services due to any cause whatsoever, Seller shall have the exclusive right to allocate Harley-Davidson Products and services to Dealer and all other dealers and customers based upon such relevant criteria which Seller may establish in its discretion from time to time, notwithstanding anything herein to the contrary. Such criteria may include, but shall not be limited to, past sales performance by dealers, inventory levels, current and future sales potential of markets, economic forecasts, Seller's operating and strategic plans, government laws and regulations, and/or any other relevant criteria.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 31 of 49 Document 1

## D. PRICES AND PAYMENT

**1. PRICES.** All sales of Harley-Davidson Products and services by Seller to Dealer will be made in accordance with the prices, charges and discounts and other terms and conditions of sale established by Seller. Seller reserves the right at any time and from time to time to change prices, charges, discounts, allowances, rebates, refunds or other terms and conditions of sale applicable to any Harley-Davidson Products and services upon issuing to Dealer new price schedules, bulletins or other written notices. Except as otherwise provided in said written notices, such changes shall apply to all Harley-Davidson Products and services ordered by Dealer and not shipped by Seller at the time such changes are made effective by Seller. Except with respect to the pricing of new model Harley-Davidson Motorcycles at the introduction thereof, any unfilled order placed by Dealer for a Harley-Davidson Motorcycle which has been increased in price prior to notice to Dealer may be canceled by Dealer pursuant to Seller's procedures then in effect, provided written notice of cancellation is delivered to Seller within a reasonable time following Dealer's receipt of notice of price change.

**2. PAYMENT.** Payment for Harley-Davidson Products and services shall be made by Dealer either cash in advance, or as otherwise agreed to by Seller in writing from time to time.

**3. DELINQUENCY.** If Dealer is delinquent in payment of any indebtedness or obligation to Seller or any affiliate of Seller, or fails to execute and return any security documents requested by Seller or any affiliate of Seller, or if Dealer is in default with respect to any provision of this Contract, then Seller, in its discretion and in addition to any other rights and remedies it may have under this Contract or at law, may suspend all pending orders and shipments to Dealer until said delinquency is cured or said security documents are received or until said default is cured, as the case may be.

## E. FACILITIES

Dealer agrees to maintain facilities of satisfactory condition and attractive appearance, which promote a tasteful atmosphere, are in a satisfactory location, provide sufficient space dedicated to Harley-Davidson Products, and are adequate to meet Dealer's responsibilities under this Contract for the display, sales, stocking and service of Harley-Davidson Products. Dealer acknowledges the importance of its facility and its effect on the Harley-Davidson experience and brand image and agrees to comply with all written facility guidelines established by Seller from time to time.

**1. LOCATION AND USE.** Dealer or any of the persons identified in paragraph 4 of the signature document of this Contract shall not, either directly or indirectly, establish any place of business for the sale or service of new or used Harley-Davidson Products or the conduct of any of Dealer's other responsibilities under this Contract at any location other than the Dealer Location, without the express prior written consent of Seller. Dealer shall not change the usage of any portion of its facilities without the prior written consent of Seller, which consent shall not be withheld unreasonably.

**2. IDENTIFICATION.** Dealer agrees to identify the operation of its independent business, including in its trade name, as Seller's authorized Dealer, all in a manner and form as may be recommended by Seller. Dealer further agrees to reasonably identify its facilities with the current approved Harley-Davidson identification. Subject to applicable laws, ordinances or regulations, Dealer shall be responsible for the installation and maintenance in a conspicuous place outside its facilities of current Harley-Davidson signage. Dealer shall also install and maintain within its facilities such signage as may be recommended to advertise properly Dealer's representation of Seller as an authorized independent dealer of Seller and on a basis mutually satisfactory to Seller and Dealer. All signs and other identification shall be compatible with the design

Case 2:20-cv-00311-LA Filed 08/23/19 Page 32 of 49 Document 1

standards established by Seller from time to time and shall be subject to Seller's written approval from time to time with respect to any display or other usage of any trademark or trade name used or claimed by Seller or any of its affiliates.

**3. HOURS OF OPERATION.** Dealer shall, subject to any applicable laws, ordinances or regulations, keep its facilities open for business during such days and hours as will most conveniently fulfill the needs of sales and service customers and based on the customary hours of similar businesses in the Territory.

**4. SELLER ASSISTANCE.** To assist Dealer in planning, establishing and maintaining adequate facilities to fulfill its responsibilities under this Contract, Seller will make available to Dealer at its written request copies of building layout plans, facility planning recommendations and the applicable identification programs covering the installation and maintenance of recommended signs. Upon Dealer's written request, Seller also will make its representatives available from time to time to counsel and advise Dealer in connection with Dealer's planning, operation, maintenance and equipping of its facilities.

## F. SERVICE

**1. SERVICE ORGANIZATION.** Dealer shall develop, maintain and operate at its facilities an effective service organization including competent service personnel in adequate numbers consistent with Seller's guidelines, essential equipment and tools, and service literature (i.e., paper or electronic) as may be determined by Seller so as to provide prompt, professional, workmanlike, courteous, and willing service to all customers requesting Harley-Davidson Motorcycle or Parts and Accessories service. Dealer shall recognize the importance of giving priority to emergency Harley-Davidson Motorcycle service work requested by customers who are touring over routine service work for its other customers, if the use of the touring customer's Harley-Davidson Motorcycle or other Harley-Davidson Products being serviced is impaired. Dealer shall perform all Harley-Davidson Product services under this Contract, including pre-delivery, warranty and recall service, as an independent contractor. All service shall be provided only by Dealer and its employees, and shall be in accordance with such standards and procedures as may be specified or recommended by Seller from time to time. Dealer agrees to post its labor rates in a conspicuous manner so that they are plainly visible to its service customers. Service provided by Dealer shall include only those services which are specifically requested by the customer or those services discussed in advance by the Dealer with the customer as being required. Dealer shall provide itemized statements to all customers for whom Dealer provides any service hereunder, and such statements shall be signed by the customer. Dealer shall assume responsibility for, and defend and hold Seller harmless from, all claims against Dealer and/or Seller caused by Dealer’s negligence or acts or omissions in performing service.

**2. PRE-DELIVERY OBLIGATIONS.** Dealer agrees to conform to Seller’s delivery expectations and to unload, set up, inspect and test each new Harley-Davidson Motorcycle prior to delivery to Dealer's customer, in accordance with Seller's written instructions. Dealer agrees to make all necessary repairs to such Harley-Davidson Motorcycle and agrees that each Harley-Davidson Motorcycle, including any accessories or equipment added thereto and sold by Dealer, will be received directly by its customer fully set up by a qualified Dealer technician and in satisfactory, lawful and safe operating condition. The provisions of this paragraph shall not apply to Harley-Davidson Motorcycles sold by Dealer to other authorized United States Harley-Davidson dealers.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 33 of 49 Document 1

**3. PRODUCT WARRANTY.** Seller may establish from time to time, by notice to Dealer, certain written warranties to Dealer and/or to Dealer's customers applicable to Harley-Davidson Motorcycles and other Harley-Davidson Products. THERE SHALL BE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE with respect to any Harley-Davidson Products, except the written warranties as may be established by Seller pursuant to this paragraph. Dealer shall make all sales of Harley-Davidson Products covered by Seller's customer warranty in such manner that Dealer's customers shall acquire all rights accorded under Seller's customer warranty. Dealer further agrees to make available written copies of and explain Seller's customer warranty to its customers prior to the consummation of any sale of Harley-Davidson Products and to advise its customers in writing that any extended warranty program that may be offered by Dealer is not a warranty of Seller. Dealer shall also deliver a copy of the customer warranty to its customer at the time of delivery of any Harley-Davidson Product covered by such customer warranty. Dealer shall also register with Seller all Harley-Davidson Motorcycles and any other Harley-Davidson Products sold by Dealer for purposes of establishing warranty protection, providing essential information in the event of a recall of Harley-Davidson Products, and/or providing Seller with useful market information, all in accordance with Seller's written procedures from time to time. Dealer shall maintain an effective service and warranty management system that complies with the requirements established by Seller from time to time.

**4. WARRANTY AND RECALL SERVICE.** Dealer agrees to repair and service all Harley-Davidson Motorcycles and Parts and Accessories which are covered by Seller's customer warranty in accordance with Seller's warranty manuals and written instructions from time to time. Dealer further agrees to perform such Harley-Davidson Product inspections and/or repairs utilizing properly trained technicians as may be required by Seller, including in furtherance of any federal or state or local laws or regulations issued thereunder. Warranty and recall services are to be provided by Dealer regardless of the origin of purchase of such covered Harley-Davidson Products. Except as otherwise provided by Seller in writing, Dealer shall use only genuine Harley-Davidson Products in performing warranty and recall service. Dealer agrees to use its best judgment on prioritizing service work, recognizing the importance, however, of providing timely recall and warranty service to customers. At the time a Harley-Davidson Motorcycle is brought to Dealer for service, Dealer shall check the vehicle recall status of the motorcycle and take appropriate action to promptly complete any open recalls. When so requested by Seller, Dealer shall provide reasonable assistance and support to effectuate the recall of a Harley-Davidson Product. Dealer shall promptly report to Seller and seek assistance with respect to any warranty, recall or other service work which cannot be performed to the Dealer's or customer's satisfaction. Seller shall give priority to such requests of the Dealer over other service assistance. Dealer will assume responsibility for, and defend and hold Seller harmless from, all claims against Dealer and/or Seller caused by Dealer's negligence or acts or omissions in performing service.

**5. CLAIMS.** Dealer shall submit claims to Seller, in such form as may be required by Seller, for compensation for labor and parts used by Dealer in performing its warranty, recall and pre-delivery obligations for retail customers under this Contract. Seller shall provide Dealer with reasonable compensation therefor. Dealer agrees to furnish Seller with full information as to its posted labor rate(s) and related information respecting service matters in such form and at such intervals as may be reasonably requested by Seller. Dealer shall maintain adequate records and documents supporting each such warranty, recall and pre-delivery claim or any other claims Dealer may make to Seller pursuant to any advertising promotion or other program of Seller. In addition to any other rights or remedies Seller may have under this Contract or at law, Seller may charge back to Dealer all payments or credits made by Seller to Dealer with respect to any warranty, recall, pre-delivery or any other claims whatsoever which were improperly claimed or paid.

**6. PRODUCT MODIFICATIONS.** Seller recognizes Dealer is an independent business and may sell motorcycle products which are not Harley-Davidson Products. To avoid disparagement of any Trademarks or Harley-Davidson Products and to avoid misleading its customers, Dealer shall, if it sells for installation or installs on any Harley-Davidson Motorcycle any item of equipment or parts or accessories that are not Harley-Davidson Products, disclose to its customer, in writing, that such item of equipment or parts or accessories has not been sold by or manufactured by or for Seller and that Seller does not assume any responsibilities therefor. Dealer agrees to indemnify, defend and hold harmless Seller and its affiliates against any and all claims, demands, suits, causes of action, damages and expenses (including reasonable attorney's fees) whatsoever arising directly or indirectly from Dealer's sale or service of non-Harley-Davidson Products, installation of non-Harley-Davidson components into Harley-Davidson Products, use of Harley-Davidson Parts and Accessories in applications not specified by Seller, or unauthorized modification of Harley-Davidson Products, all of which shall be the responsibility of Dealer.

. **7. SALES AND WARRANTY REGISTRATION FORM.** Dealer shall complete and electronically file with Seller a sales and warranty registration form for every new Harley-Davidson Motorcycle sold by Dealer. Dealer must file such form with Seller within ten (10) days of the delivery of such Harley-Davidson Motorcycle to its customer to comply with the provisions of the National Traffic and Motor Vehicle Safety Act, Public Law 89-563, as amended, and to qualify the Harley-Davidson Motorcycle for coverage under Seller's customer warranty. Dealer shall maintain a hard copy of all sale documents, including a hard copy of the fully completed and signed sales and warranty registration form, in its files for a minimum of five (5) years from the date of sale.

In the interest of safety and the highest level of customer satisfaction, Seller also highly recommends that Dealer should complete and electronically file with Seller a sales and warranty registration for every used Motorcycle sold by Dealer that is within the warranty period.

## G. TRAINING

Dealer and Seller agree that training of all Dealer employees is critical to providing retail customers a satisfactory sales and service experience with Harley-Davidson and to the success of Dealer and Seller in conducting business under this Contract. Therefore, Dealer shall have the right to send its employees who may be eligible to attend Seller's service schools, seminars, and other training programs as may be offered by Seller (or any affiliate of Seller). Dealer agrees that it will employ sufficient numbers of employees fully trained in the Harley-Davidson Products, sales, service, customer satisfaction/experience, finance and insurance (F&I), systems, and various other areas in accordance with standards established by Seller. Dealer further agrees that it shall ensure that each of its service technicians is highly qualified and knowledgeable of the Harley-Davidson Products, and, when need be, that its service technicians complete service seminars and schools and participate in service training programs that may be offered or sponsored by Seller in accordance with such standards. Dealer and Seller will cooperate to make such training available to Dealer’s employees in a cost-effective manner.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 35 of 49 Document 1

## H. CUSTOMER SATISFACTION AND EXPERIENCE

A goal of Seller and Dealer is for the Harley-Davidson brand name to be synonymous with the highest levels of customer satisfaction. Dealer will take all reasonable steps to ensure that all customers are completely satisfied with their Harley-Davidson Products and the services and practices of Dealer. Dealer agrees that satisfaction must occur before, at the time of, and after each sale or service to a customer, by program participation, advertising, promotion, display, demonstration, instruction, sponsorship and other involvement with Seller's Harley Owners' Group ("H.O.G.") program, other motorcycle organizations, community activities, and by other ways of providing personal attention from the Dealer's retail facility. Dealer will not engage in any practice or method of operation if its nature or quality may impair the reputation of Seller, the Harley-Davidson name or Harley-Davidson Products. Dealer shall evaluate adopting recommendations by Seller for improving customer satisfaction, but Dealer shall not wait for or rely only upon such recommendations because customer satisfaction always remains an independent obligation of Dealer.

## I. ADVERTISING

**1. DEALER RESPONSIBILITIES.** Dealer agrees to develop, utilize and participate in various advertising and sales promotion programs, in a manner consistent with Seller's brand identity guidelines, in fulfilling its responsibilities for selling, promoting and advertising Harley-Davidson Products in the Territory. In so doing, primarily to promote sales and service in the Territory, Dealer agrees to: (a) maintain a dealer webpage or site in a manner approved by Seller; (b) make reasonable use of newspaper, direct mail, television, radio or other appropriate advertising media directed to customers in the Territory; (c) participate to a reasonable and prudent extent in advertising or sales promotion programs offered from time to time by Seller and in accordance with the applicable provisions and rules thereof; (d) participate to a reasonable extent in Harley-Davidson's H.O.G. program; and (e) make every reasonable effort to build and maintain customer interest in Harley-Davidson Motorcycle activities and confidence in Dealer, Seller and Harley-Davidson Products.

**2. SELLER ASSISTANCE.** To assist Dealer in fulfilling Dealer's advertising and promotion responsibilities, Seller may develop and offer from time to time various advertising and sales promotion programs to promote the sale of Harley-Davidson Products for the mutual benefit of Seller and Dealer. Seller may also offer to Dealer from time to time advertising and sales promotion material without charge or for purchase by Dealer at Seller's discretion.

**3. DIRECT MAIL.** Dealer recognizes the usefulness and benefits of any cooperative direct mail Harley-Davidson Product advertising programs that may be offered by Seller and therefore will give its utmost consideration to participating in any such programs during the term of this Contract, subject to Seller's offering a direct mail program from time to time. The terms and conditions of Dealer's participation in any such programs shall be covered by separate written agreement between the parties.

**4. PROHIBITED PRACTICES.** In recognition of the need to maintain the highest standards of ethical advertising and business practice, neither Seller nor Dealer will publish or cause or permit to be published any representation or advertising relating to Harley-Davidson Products or their servicing which may mislead or deceive the public, impair the goodwill of Seller, the Trademarks, Dealer or the reputation of Harley-Davidson Products. Dealer shall not represent or sell any custom-built motorcycle as a Harley-Davidson Product. Dealer shall avoid in every way any deceptive, misleading, confusing, illegal or "bait" advertising or business practice. Seller agrees not to publish or employ any such advertising or practice or encourage Dealer to do so.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 36 of 49 Document 1

## J. OTHER RESPONSIBILITIES

**1. FINANCIAL REPORTING.** Dealer agrees to furnish Seller, on a monthly, quarterly or annual basis as Seller may request, financial reports and data giving Seller a complete, true and accurate accounting of Dealer's dealership operations for the time periods requested. Dealer's financial reports shall consist of a balance sheet and profit and loss statement, and all financial reports shall be in such form as may be reasonably required by Seller (which may include preparation and presentation in accordance with generally accepted accounting principles). Dealer shall furnish its financial reports and data to Seller no later than fifteen (15) days following the close of each month (for monthly statements), thirty (30) days following the close of each quarter (for quarterly statements) or sixty (60) days following the close of Dealer's fiscal year (for annual statements), as the case may be. Dealer agrees also to promptly furnish Seller a copy of any adjusted financial report that may be prepared by or for Dealer. Dealer agrees to furnish all financial reports and data in accordance with the written guidelines established by Seller from time to time for financial reporting. All such financial information furnished by Dealer shall be handled by Seller on a confidential basis and, unless authorized by Dealer or required by law or offered in evidence in judicial or administrative proceedings, such financial information shall not be furnished to any party other than Seller, its subsidiaries, affiliates and agents.

**2. OTHER REPORTS AND DATA.** Dealer and Seller both recognize the importance of having access to relevant information on a timely basis in order to compete more effectively. Dealer will cooperate with Seller and its affiliates in furnishing inventory, retail sales and other reports and data as may reasonably be requested by Seller or its affiliates from time to time.

**3. COMPLIANCE WITH LAWS.** Dealer shall at all times conduct its business in full compliance with all applicable federal, state and local laws, rules and regulations, including but not limited to complying with state and federal unfair practice laws and delivering Harley-Davidson Motorcycles and providing all Harley-Davidson Motorcycle service and repairs in compliance with all applicable safety, emissions and noise regulations. Seller and Dealer agree to provide each other such information and assistance as may reasonably be requested by the other in connection with the performance of their respective obligations under such laws, rules and regulations.

**4. CAPITAL AND CREDIT REQUIREMENTS.** Dealer recognizes that in order to properly fulfill its responsibilities under this Contract, it is necessary for Dealer to provide and maintain at all times sufficient net working capital and floor plan credit lines, the amount of which will depend upon the size of Dealer's operations as contemplated by this Contract. Based on its reasonable guidelines, Seller will establish for Dealer from time to time the minimum net working capital and floor plan credit line requirements for Dealer's operations, and Dealer agrees to meet said requirements.

**5. INSURANCE.** Dealer shall procure at its expense and maintain at all times customary property, theft and liability insurance insuring its facilities, fixtures, equipment, inventory of Harley-Davidson Products and all other property of Dealer, for the full value thereof. Said insurance shall name Seller as a loss payee and Dealer agrees that all proceeds of said insurance shall be used in part to pay Seller promptly all amounts owed Seller for Harley-Davidson Products and services purchased by Dealer and unpaid as of the date of loss, whether or not said unpaid amounts were then due. Dealer agrees to provide Seller with satisfactory evidence of said insurance coverage and notify Seller immediately in writing of any changes in said insurance coverage.

**6. INSPECTIONS.** Dealer shall allow persons designated by Seller, at reasonable times and intervals and during normal business hours, to examine Dealer's facilities, operations and inventory of Harley-Davidson Products at Dealer's facilities for sales, service or repair, to assist and instruct Dealer in the operation of its business, and to audit and copy or obtain originals as Seller may elect of any and all of Dealer's records and documents pertaining to its performance of this Contract. Dealer will cause all such records and documents to be maintained in a readily accessible form at the Dealer Location for a period of no less than five (5) years.

**7. DATA TRANSMISSION SYSTEMS.** Seller and Dealer recognize and agree that providing the highest level of service and support and achieving the other goals of this Contract involve the integration of people, technology and business systems. To promote that integration, Dealer agrees to maintain and utilize a computer system that meets the Dealer's internal business needs and permits direct communication between Dealer and Seller. Seller may establish from time to time reasonable standards and policies as it believes are necessary or advisable to carry out the purpose or intent of this part of this Contract.

**8. CONFIDENTIALITY.** Dealer shall strictly maintain the confidentiality of all non-public information and documents provided to it by or on behalf of Seller, or to which it has access through Seller, including information and documents in any form or format now or hereafter developed regarding product development, new products, production and delivery schedules, pricing, marketing plans, methods of accessing internal information (electronically or otherwise) and other proprietary matters. Dealer shall not disclose any such information or documents to any other person, including to any competitors or customers.

## K. TRADEMARKS

**1. OWNERSHIP.** Dealer acknowledges that Seller's affiliate, H-D USA, LLC, a Wisconsin limited liability company, located at 3700 W. Juneau Avenue, Milwaukee, Wisconsin ("HDUSA") is the exclusive owner, and Seller is HDUSA's licensee, of the various trademarks, service marks and trade names, and/or word and design marks and copyrights (referred to in this Contract as "Trademarks") which Seller uses in connection with Harley-Davidson Products and the servicing thereof and the service and products licensed by Seller (referred to in this Contract as "Licensed Products") or which Seller or HDUSA otherwise claim. Dealer further acknowledges the great value of and goodwill associated with the Trademarks and the fact that they have acquired a secondary meaning in the minds of the public. Dealer, either during the Term of this Contract or thereafter, shall neither have nor claim any rights in respect to the Trademarks or otherwise attack the title or any rights of HDUSA or Seller or their parents, subsidiaries or other affiliates in and to the Trademarks. All images, graphics, trademarks, trade dress, logos, artwork, slogans, text, domain names, and other works of authorship created by or on behalf of Dealer for use in connection with Dealer's authorized dealership which directly or indirectly incorporate, refer or relate to Harley-Davidson or Harley-Davidson Trademarks shall belong exclusively to HDUSA, and Dealer hereby assigns all right, title and interest in and to said works to HDUSA. Dealer shall execute whatever additional documents HDUSA or Seller deem necessary and appropriate, in their sole discretion, to vest in HDUSA title to said works. Dealer shall also cause any third party retained by Dealer to create, in whole or in part, any of said works to execute whatever assignments and other documents HDUSA or Seller, in their sole discretion, deem necessary and appropriate to vest ownership in said works in HDUSA and shall inform any such third party of the requirements of this paragraph prior to retaining them. Dealer shall not register or apply to register as a trademark its corporate name or any other name or mark which incorporates any of the Trademarks with any state, federal or other governmental entity.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 38 of 49 Document 1

**2. DISPLAY.**  Dealer is granted the non-exclusive, non-transferable license to display the Trademarks solely in the conduct of its authorized Harley-Davidson dealership business but only in the manner approved by Seller and HDUSA from time to time.  The right to use the Trademarks in connection with products is limited to Harley-Davidson Products purchased from Seller or Licensed Products purchased from an authorized licensee of Seller, and Dealer shall use the Trademarks only in connection with services which are authorized and conform to quality standards established by Seller from time to time.  Such Trademarks may be used as part of the name under which Dealer's authorized Harley-Davidson dealership business is conducted only with the express written approval of Seller and HDUSA and within such guidelines as Seller may establish from time to time.  This license or any approval previously granted by Seller and HDUSA shall terminate automatically upon the termination of this Contract for any reason, or may be canceled or withdrawn by Seller and HDUSA at any time without cause.  Moreover, Dealer shall discontinue immediately the display or use of any Trademarks or change the manner in which such Trademarks are displayed or used whenever requested to do so by Seller and HDUSA.  The Trademarks may not be used by any business owned or controlled in whole or in part by Dealer or any of its Owner(s) without Seller's and HDUSA's prior written consent.  Dealer shall acquire no rights in the Trademarks by virtue of any such use, but such use shall inure to the benefit of Seller and HDUSA.  Dealer shall not create nor cause to be created on its behalf any logos, slogans, artwork, designs, or marks incorporating any of the Trademarks or any stylized representations or variations thereof or to be used in connection with any of the Trademarks without the prior approval of HDUSA and Seller.  Dealer shall not use any other name or mark in combination with any of the Trademarks without the prior written approval of Seller or HDUSA (which approval may be withheld by Seller or HDUSA in their sole discretion). Dealer shall indemnify and hold harmless Seller and/or HDUSA against any allegation of infringement of a third party's intellectual property rights caused by or resulting from independent acts or omissions of the Dealer. Dealer shall not register as a trademark any name or mark that incorporates any of the Trademarks.  This Contract does not authorize Dealer to display or in any way use, and Dealer is hereby expressly prohibited from displaying or in any way using Trademarks in connection with any restaurant or other beverage or food service operation at any location, including at the Dealer Location, except as expressly permitted in writing by Seller.

**3. REPRESENTATION AS TO PRODUCTS.**  Dealer shall not sell or offer for sale as Harley-Davidson Products any products which are not either Harley-Davidson Products or Licensed Products purchased from any authorized licensee of Seller.  Dealer shall not purchase for resale or any other distribution any products bearing the Trademarks from any source other than Seller or its authorized licensees without the prior written approval of Seller or HDUSA.  In addition, Dealer shall not create or have created on its behalf any products to be sold or otherwise distributed at Dealer's authorized Harley-Davidson dealership or elsewhere utilizing Dealer's trade name or any of the other Trademarks or any variations or stylized representations thereof.  Dealer shall not alter, obscure, remove or otherwise interfere with any trademarks, trade names, word marks, design marks or other permanent markings placed on any Harley-Davidson Product by the manufacturer or otherwise under the authority of Seller or HDUSA.  Dealer shall not place any trademarks, trade names, word marks, design marks or other permanent markings on any Harley-Davidson Product without the prior written approval of Seller or HDUSA (which approval may be withheld by Seller or HDUSA in their sole discretion).  Dealer shall not engage in any conduct or take part in any activity which, with reference to the Trademarks, might tend to impair the validity or enforceability of any of the Trademarks or any registrations thereof; or which might dilute the distinctive quality of the Trademarks or which might tend to disparage the Trademarks or Seller or HDUSA or which might be considered unfair competition or an infringement or other violation of Seller's rights; or which would be likely to cause any confusion, mistake or deception as to whether any third party is an authorized Harley-Davidson dealer or is otherwise sponsored by or affiliated with Seller or HDUSA if that party is not or whether any third party's products are licensed, sponsored or approved by or originate with Seller or HDUSA if they are or do not.  Dealer shall not have any rights against Seller or HDUSA for damages or other remedy by reason of Seller's or HDUSA's alleged failure to prosecute any alleged infringements or imitations by others of the Trademarks.

Case 2:20-cv-00311-LA   Filed 08/23/19   Page 39 of 49   Document 1

**4. CONSENT TO USE SELLER'S TRADEMARKS.** Dealer agrees that it has no right whatsoever to object to or otherwise prevent Seller's allowing any other person to display the Trademarks or use them as part of any business name.

**5. ENFORCEMENT.** Dealer agrees upon notice from Seller or HDUSA to immediately discontinue use of and to remove from its premises or wherever they may appear all materials bearing any of the Trademarks, including without limitation any signs, labels, stationary, advertising and reading material, Internet site, or mobile applications, that Seller or HDUSA determine constitute an improper use of the Trademarks or reflect adversely on the reputation or brand image of HDUSA, Seller, or any of their affiliated companies or their businesses, products or services. Dealer agrees and undertakes fully and without reservation to render to HDUSA and Seller all assistance in connection with any matter pertaining to the protection, enforcement, registration or licensing of the Trademarks, whether in the courts, administrative agencies or otherwise, and to make available to Seller or its duly authorized representatives all of Dealer's records, files and other information pertaining to the purchase, preparation, manufacture, sale and/or distribution of the goods identified by the Trademarks and the rendering of services under the Trademarks as may be necessary for the purposes of attaining or assisting in said protection, enforcement, registration or licensing. Dealer agrees that it will, whenever requested by HDUSA or Seller, assist HDUSA in the registration of any service mark, trademark, or trade name heretofore or hereafter used on products sold by Dealer and manufactured or marketed by or with authorization of Seller or in connection with services rendered by Dealer. The obligations of Dealer under this Part K inure to the benefit of HDUSA, Seller, their successors and assigns and shall survive the termination or expiration of this Contract for any reason. If Dealer shall refuse or neglect to keep and perform its obligations under this Part K, Dealer shall reimburse Seller for all costs, reasonable attorneys' fees and other expenses incurred by Seller in connection with any action to require Dealer to comply therewith.

**6. DEALER.** As used in this Part K with respect to restrictions on Dealer, the term "Dealer" shall also include any affiliates of or other companies owned by Dealer and all managers and/or Owner(s) of Dealer.

**7. DOMAIN NAMES.** Subject to HDUSA's approval, Dealer may register domain names that conform to Dealer's trade name or dealership name. HDUSA reserves the right at all times, and within HDUSA's sole discretion, to determine whether any particular domain name (in addition to Dealer's trade name or dealership name) is suitable if Dealer's web site relates to Harley-Davidson dealership operations or displays the Trademarks. Upon written request by HDUSA, Dealer shall cancel or take any steps necessary to assign any domain name incorporating any Trademark to HDUSA. Dealer shall comply with Seller's Internet guidelines issued and in effect from time to time.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 40 of 49 Document 1

## L. CHANGES IN DEALER OPERATOR OR OWNERSHIP

**1. APPROVAL BY SELLER.** Dealer shall give Seller prior written notice and a complete explanation of any proposed transfer, sale or other change in ownership, Dealer Operator, Onsite Owner, Owner(s), or business structure of Dealer, no matter what the share or relationship between the parties, and immediate notice of the death or incapacity of the Dealer Operator, Onsite Owner, or any Owner(s). No such notice or change may be made or shall be effective against Seller unless and until Seller gives its prior written approval, which Seller shall not unreasonably refuse, and the change is set forth in a new dealer contract or a written amendment to this Contract duly executed by Seller and Dealer. Dealer agrees that factors which would make Seller's refusal to give its approval reasonable include, without limitation, the unwillingness of the proposed owner or dealer operator to accept and comply with Seller's dealer contract or with its Dealer Ownership Policy, or the failure of a proposed owner or dealer operator to meet Seller's standards for capital or financial capability, personal qualifications, business experience or the onsite/actively involved in the dealership operations requirements of the Dealer Ownership Policy. . Notwithstanding the foregoing, if the proposed successor owner is the spouse or child of such person, Seller agrees to waive its personal qualifications standard (except as to any matter described in subparagraph M.6(a) of these General Conditions). Additionally, Seller is not obligated to approve a proposed change, execute an amendment to this Contract or enter into a new dealer Contract unless Dealer makes arrangements acceptable to Seller to satisfy any indebtedness to Seller. Except for Seller or Harley-Davidson, no publicly-owned corporation or private equity firm may, directly or indirectly, in whole or in part, own and/or operate any Harley-Davidson dealership, unless otherwise permitted by Seller's Dealer Ownership Policy. Additionally, no person or entity may, directly or indirectly, in whole or in part, own and/or operate a number of Harley-Davidson dealerships in excess of the number permitted by Seller's provisions on multiple dealership ownership in the Dealer Ownership Policy. Dealer agrees that it would be reasonable for Seller to refuse to give its approval to a proposed transfer, sale or other change in ownership or dealer operator if such transfer, sale or other change would result in the direct or indirect public ownership or operation of any Harley-Davidson dealership or if it would result in any person or entity, directly or indirectly, in whole or in part, owning and/or operating a number of Harley-Davidson dealerships in excess of the number permitted under Seller's policy on multiple ownership. Seller may establish and amend from time to time such policies on public ownership and multiple ownership as it believes are necessary or advisable to carry out the purpose or intent of this paragraph.

**2. DEATH OR INCAPACITY OF DEALER OPERATOR OR OWNER.**

**(a) INCAPACITY.** As used in this Contract, "incapacity" shall refer to any physical or mental ailment of Dealer Operator, Onsite Owner, or any Owner(s) that adversely affects Dealer's ability to meet its obligations under this Contract.

**(b) TERMINATION.** This Contract shall automatically terminate effective ninety (90) days after the death or incapacity of Dealer Operator, Onsite Owner, or any Owner(s), provided that Dealer may request an extension of the effective date of expiration to assist Dealer in winding up its dealership business or to provide for a transfer of assets or ownership previously approved under this Contract. The request must be made, however, at least thirty (30) days prior to the effective date of termination, in which event Seller will not unreasonably refuse to grant such an extension. Dealer agrees that factors which would make Seller's refusal to grant such an extension reasonable include, without limitation, an unreasonably long period of deferral, a dispute regarding entitlement to Dealer assets or a deceased or incapacitated Owner(s)' interests, inadequate consumer sales, service or satisfaction in the Territory, or impairment of the Harley-Davidson name or the Trademarks.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 41 of 49 Document 1

**(c) SUCCESSOR NOMINATION.** Dealer may apply for a Successor Nomination designating a proposed dealer operator and/or owner(s) of a successor dealer to be established under a new dealer contract, in order to continue the operations identified in this Contract after it terminates because of death or incapacity. Seller will execute the Successor Nomination if the proposed dealer operator or owner(s) meet Seller's standards for approving changes in such regards. If the proposed dealer operator or owner(s) is the spouse or child of the Dealer Operator or any Owner(s) and provided the matters described in subparagraph M.6.(a) of these General Conditions would not be applicable to him or her, Seller shall execute the Successor Nomination if the spouse or child meets or agrees to meet Seller's requirements relating to business experience and the onsite/actively involved in the dealership operations requirements of the Dealer Ownership Policy. However, the proposed dealer operator or owner(s) will not be required to meet usual capital or financial capability requirements until after the Successor Nomination is implemented by death or incapacity, in which event the proposed person(s) will provide Seller within thirty (30) days prior to the termination of this Contract, including any deferrals, such information as Seller requires.

**(d) NEW SUCCESSOR NOMINATION.** Dealer may cancel an executed Successor Nomination at any time prior to the death or incapacity of the Dealer Operator or Owner(s). Seller may cancel an executed Successor Nomination only if the proposed dealer operator or owner(s) no longer meet the Seller's standards. The parties may execute a superseding Successor Nomination by agreement. A Successor Nomination shall expire automatically upon expiration of the term of this Contract.

**(e) INDEPENDENT ACTION REQUIRED BY DEALER.** Dealer acknowledges that Owner(s) have the independent responsibility to take whatever actions are necessary to create the right in the proposed owner(s) to any transfer of Ownership approved by the Seller under the Successor Nomination.

**(f) RIGHTS OF REMAINING OWNER(S).** If the Dealer Operator, Onsite Owner, or any Owner(s) dies or is incapacitated and Dealer and Seller have not executed a Successor Nomination in that regard, any remaining Owner(s) and/or the legal representative of a deceased or incapacitated Owner(s) may propose a dealer operator and/or owner(s) of a successor dealer to be established under a new dealer contract, in order to continue the operations identified in this Contract after it terminates because of death or incapacity. The proposal, including all applications and information reasonably requested by Seller to reach its decision, must be made in writing to Seller at least thirty (30) days prior to the termination of this Contract, including any deferrals. Seller will accept a proposal, provided that (a) the proposed successor dealer's owner(s) and dealer operator meet Seller's standards and are ready, willing and able to comply with the requirements of a new dealer contract; and (b) all outstanding monetary obligations of Dealer to Seller have been paid.

**(g) LIMITATION ON OFFERS.** Within sixty (60) days after receiving the required information, Seller will notify Dealer in writing of its decision regarding, as applicable, (a) the capital or financial capability requirements of a person previously approved under a Successor Nomination, or (b) a proposal submitted as required where no Successor Nomination was executed. Seller's offer of a new dealer contract under such circumstances will automatically expire if not accepted by the proposed successor dealer within sixty (60) days after it receives the offer.

**3. SUCCESSION PLAN.** To enable Seller to maintain the high quality of its dealer network and to make plans for serving the future needs of customers in the Territory, Dealer shall have the right to furnish Seller with (a) an application for a Successor Nomination in the event of death or incapacity of Dealer Operator or any Owner(s), and/or (b) a written plan detailing such person's plans for eventual retirement and the proposed succession to such person's interest. All such plans shall be subject to Seller's approval as provided above.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 42 of 49 Document 1

**4. RIGHT OF FIRST REFUSAL.** When Dealer submits to Seller a proposal pursuant to paragraph L.1 to sell or otherwise transfer a majority of Dealer's assets or Ownership, Seller has a right of first refusal enabling Seller to assume the buyer's rights and obligations under any such proposal and/or buy/sell agreement, to purchase the dealership assets, stock or other form of Ownership interest, including any leasehold interest or realty, and to cancel this Contract and all rights granted Dealer, excepting only a proposal to transfer to a person approved by Seller under an effective Successor Nomination or other plan pursuant to the preceding paragraph L.3. Seller's exercise of its right of first refusal is not dependent upon whether the proposed buyer is qualified to be a dealer operator or owner, does not require Seller's prior refusal to approve the proposed change, and supersedes any right to sell, transfer or change its interest in, or Ownership of, the Dealer. Seller may exercise its right within thirty (30) days after Seller's receipt of all data and documentation required by it to evaluate the proposed sale, transfer or other change in Ownership, which Dealer agrees promptly to provide, including but not limited to information reflecting other agreements or understandings between the parties to the buy/sell agreement. Seller's right may be assigned by it to any third party and Seller hereby guarantees the full payment to Dealer and/or Owner(s) of the purchase price by such assignee. Seller may disclose the terms of any pending buy/sell agreement and any other relevant Dealer performance information to any potential assignee. Seller's rights in this regard are binding on and enforceable against any assignee or successor in interest of Dealer or purchaser of Dealer's assets not previously approved by Seller as provided in this Part L.

## M. TERMINATION

**1. AUTOMATICALLY ON DEATH OR INCAPACITY.** This Contract shall automatically terminate prior to its expiration as provided in Part L of these General Conditions effective ninety (90) days after the death or incapacity of Dealer Operator, Onsite Owner, or any Owner(s), unless extended by Seller as provided under that Part.

**2. BY DEALER.** This Contract may be terminated by Dealer prior to its expiration and without cause by providing no less than thirty (30) days prior written notice via certified mail to Seller, Attention: Managing Director, United States.

**3. BY EITHER PARTY.** This Contract may be terminated by either party prior to its expiration by providing no less than fifteen (15) days prior written notice to the other:

(a) Upon the institution of voluntary or involuntary bankruptcy proceedings by or against the other party, or if the other party shall make an assignment for the benefit of creditors, a Receiver or Trustee be appointed, become insolvent or dissolution of the other party.

(b) If the other party shall fail to perform its financial obligations to the other party, or a subsidiary or affiliate of the other party, following written demand.

(c) If the other party requires a license, permit or other authorization for the performance of any responsibility under this Contract in any jurisdiction where this Contract is to be performed and said party shall fail to secure and maintain such authorization, or if such authorization is suspended or revoked, irrespective of the cause or reason, subject to a thirty (30) day right to cure by Dealer or Seller, as the case may be.

Case 2:20-cv-00311-LA   Filed 08/23/19   Page 43 of 49   Document 1

**4. BY SELLER.** This Contract may be terminated by Seller prior to its expiration by providing no less than thirty (30) days prior written notice to Dealer:

(a) For any transfer or attempt to transfer by Dealer of any interest in, or right, privilege or obligation under this Contract, or transfer by operation of law or otherwise, of any of the principal assets of Dealer that are required for the conduct of its business; or any removal or other change, however accomplished, directly or indirectly, of the Dealer Operator or in the Ownership of Dealer approved under this Contract without first notifying Seller and obtaining its prior written consent, or without affording Seller a reasonable opportunity to exercise its right of first refusal, as required by this Contract.

(b) If Dealer submits to Seller or to any affiliate of Seller any application, claim, report, record or other information which is fraudulent or contains any material misrepresentation by Dealer, or if Dealer, after written warning from Seller, shall have engaged in any advertising or business practice contrary to the provisions of paragraph I.4 or J.3 of these General Conditions.

(c) If Dealer shall fail for any reason to function in the ordinary course of business, maintain its dealership facilities open for business as provided in paragraph E.3 of these General Conditions or if Dealer shall otherwise abandon its Harley-Davidson dealership operations.

**5. DEALER'S FAILURE TO PERFORM SALES, SERVICE AND FACILITIES RESPONSIBILITIES.** Except as otherwise provided herein, this Contract may be terminated by Seller prior to its expiration if Dealer shall fail to fulfill any of its sales, service or facilities responsibilities under this Contract. Seller shall advise Dealer in writing of such failures and will offer to review promptly with Dealer the reasons which, in Seller's opinion, or in Dealer's opinion account for such failure or failures and will provide Dealer with a reasonable opportunity to cure the same. Seller may terminate this Contract upon no less than ninety (90) days prior written notice to Dealer in the event Dealer fails or refuses to cure the same within the reasonable time allowed after the initial letter of Seller required in this paragraph.

**6. DEALER'S FAILURE TO PERFORM OTHER RESPONSIBILITIES.** The following conduct entitles Seller to terminate this Contract prior to its expiration by providing no less than sixty (60) days prior written notice to Dealer:

(a) Any (i) conviction of, or any plea of no contest by, Dealer, the Dealer Operator or any Owner(s) in a court of original jurisdiction with respect to any crime, or (ii) civil or administrative liability found against Dealer, the Dealer Operator or any Owner(s) for any motor vehicle-related matter other than minor traffic offenses, either of which tends to affect adversely the Ownership, operation, management, reputation, business, goodwill or interests of Dealer or Seller, or to impair the goodwill associated with the Trademarks.

(b) Any dispute, disagreement or controversy among managers, officers, directors or Owner(s) of Dealer that, in the reasonable opinion of Seller, adversely affects the Ownership, operation, management, reputation, business, goodwill or interests of Dealer or Seller.

(c) Seller reasonably believes that the Dealer, Dealer Operator or any Owner(s) has failed, refused or neglected to conform his or her conduct (whether personal or business) with Seller’s Purpose, standards of good citizenship or generally acceptable behavior in contemporary society or the local community, in a way that may adversely affect the Ownership, operation, management, reputation, business, goodwill or interests of Dealer or Seller, or may impair the goodwill associated with the Trademarks.

(d) Failure to replace, within one hundred twenty (120) days after written notice from Seller, a Dealer Operator approved under this Contract who, in Seller's reasonable opinion, no longer possesses the requisite qualifications for the position or has acted in a manner contrary to the continued best interests of both Dealer and Seller.

(e) Impairment of the reputation or financial standing of Dealer subsequent to the execution of this Contract.

(f) Breach, violation or failure to fulfill any of Dealer's other responsibilities under this Contract.

**7. RESPONSIBILITIES FOLLOWING TERMINATION.** On termination or expiration of this Contract for any reason and if a new Contract is not entered into by mutual agreement of the parties:

(a) Dealer agrees to pay forthwith to Seller and all affiliates all sums due for Harley-Davidson Products purchased or services rendered.

(b) Dealer agrees to cease using the Trademarks in any manner, including but not limited to in a corporate name, telephone directory, website (including metatags or source code), domain name, or outdoor sign, any advertising or representation, express or implied, to the public that Dealer is authorized to purchase Harley-Davidson Products from Seller for resale or that Dealer is authorized by Seller to provide service to Seller's products. Dealer shall immediately deliver to Seller all signs, banners, point of purchase displays and the like bearing any of the Trademarks. Any domain name used by Dealer which incorporates any of the Trademarks shall be automatically assigned to HDUSA, and Dealer shall not contest this assignment or thereafter use any such domain name. If Dealer shall refuse or neglect to keep and perform this provision, Dealer shall reimburse HDUSA for all costs, reasonable attorney's fees and other expenses incurred by HDUSA in connection with any action to require Dealer to comply herewith.

(c) Dealer agrees all unfilled orders for Harley-Davidson Products and services previously accepted by Seller are canceled forthwith and Seller will remit to Dealer in a reasonable time any net balance due Dealer.

(d) Dealer agrees to return or destroy all confidential information provided to Dealer by Seller and all customer information collected or obtained by Dealer while it was an authorized Harley-Davidson dealership, except for such information as Dealer is required by law to retain. Dealer’s obligations under Part J.8 of this Contract shall survive the termination or expiration of this Contract.

**8. SUBSEQUENT RELATIONS.** In the event that either party has any business dealings with the other party with respect to Harley-Davidson Products or service following the termination or expiration of this Contract, such dealings shall not constitute either a renewal of this Contract or a waiver of such termination or expiration. However, all such dealings shall be governed by terms identical with the provisions of this Contract for the duration of such dealings unless the parties execute a new and different agreement with respect to such dealings.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 45 of 49 Document 1

## N. TERMINATION OF SPECIAL MARKET RIGHTS

In the event Dealer earns Special Market Rights described in paragraph 6 of the signature document but Dealer's performance subsequently fails to meet the Special Market Rights Performance Criteria, Dealer's Special Market Rights shall not terminate unless and until Dealer receives written notice from Seller of such failure, and Dealer thereafter fails to meet the Special Market Rights Performance Criteria within the period prescribed by Seller. In the event Dealer earns Special Market Rights but subsequently breaches or is discovered to have breached any terms and conditions of this Contract, Dealer's Special Market Rights shall terminate upon written notice to Dealer of such breaches from Seller.

## O. DISPUTE RESOLUTION PROCESS

**1. OPTIONAL REMEDY.** Seller and Dealer believe that their mutual commitment to the Purpose and Valued Behaviors should minimize the potential for disputes between them. Nevertheless, disputes may occur which cannot be resolved in the normal course of business.

Seller and Dealer acknowledge that, at the state and federal levels, various courts and agencies may be available to them to resolve claims or controversies which might arise between them. Consistent with the provisions of the United States Arbitration Act (9 U.S.C. Section 1 *et seq*.), Dealer and Seller agree that the Dispute Resolution Process outlined in this Part O, which includes binding arbitration, shall be an optional mechanism for resolving any controversy or claim between them arising out of or relating to this Contract, its creation or termination. Participation in the Dispute Resolution Process is strictly voluntary. Dealer and Seller must both agree to use this Dispute Resolution Process to resolve a specific controversy or claim in order for this Part O to apply.

There are two steps in the Dispute Resolution Process: Mediation and Binding Arbitration. Any claim or controversy that both Dealer and Seller agree to resolve through the Dispute Resolution Process must first be submitted to Mediation, unless that step is waived by written agreement of the parties. If Mediation does not resolve the dispute to their mutual satisfaction, then Dealer or Seller may agree to submit the dispute to Binding Arbitration.

**2. MEDIATION.** Dealer or Seller may submit to Mediation a claim or controversy between them which arises out of or relates to the Dealer Contract. Mediation is conducted by a neutral mediator selected by the parties from a list of alternates. Seller and Dealer agree that the procedures contained in the Harley-Davidson Alternative Dispute Resolution Guide govern Mediation under this Part.

**3. BINDING ARBITRATION.** If a claim or controversy arising out of or relating to this Contract has not been resolved after Mediation, or if Dealer and Seller have agreed in writing to waive Mediation, the claim or controversy may be settled by Binding Arbitration in accordance with the procedures in the Harley-Davidson Alternative Dispute Resolution Guide. All awards of the arbitrator are binding and non-appealable except as otherwise provided in the United States Arbitration Act. Judgment upon any award rendered by the arbitrator(s) may be entered and enforced in any court having jurisdiction.

## P. MISCELLANEOUS

**1. NOT AGENCY.** It is mutually agreed that Dealer is not an agent or employee of Seller and Dealer agrees not to make any representations to others in which said relationship may be presumed or to attempt to assume or create any obligations on behalf of Seller, except with Seller's express prior written consent.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 46 of 49 Document 1

**2. PRODUCT AND DESIGN MATTERS.** Seller reserves the right to revise the Products Addendum to this Contract, including the right to add, discontinue or withdraw, as to all authorized United States Harley-Davidson dealers, any Harley-Davidson Products at any time without liability to Dealer and to make any changes in design or add improvements on any Harley-Davidson Products without incurring any obligation to install same on Harley-Davidson Products previously purchased. Furthermore, Seller reserves the right to offer any new, different or differently designated motorcycle, motor vehicle, parts and accessories therefor (including replacement parts, mechanical accessories, tools, lubricants, equipment and other supplies for the operation of motorcycles), clothing and/or any other product bearing any Trademarks or brand names used or claimed by Seller or any of its affiliates, including the name "Harley-Davidson," to select authorized Harley-Davidson dealers other than Dealer, or to others, under existing or separate new agreements. Nothing contained herein shall be construed to limit Seller's right to test market selected products with Dealers in certain markets for limited periods of time.

**3. DEALER RESTAURANTS.** Dealer shall not own or operate, in whole or in part, directly or indirectly, any restaurant or other beverage or food service operation ("Restaurant") at, or in close proximity to, the Dealer Location, or any additional location, e.g. a Secondary Retail Location or an Alternate Retail Outlet, without the prior written consent of Seller. Nothing in this paragraph is intended to prohibit the Dealer from owning or operating, in whole or in part, directly or indirectly, any Restaurant provided that such Restaurant is not at or in close proximity to the Dealer Location and does not have a motorcycle theme or use or display the Trademarks. Seller may establish from time to time such guidelines or license agreements as it believes are necessary or advisable to carry out the purpose or intent of this paragraph.

**4. TERMINATION OF BUELL SERVICE AGREEMENT.** If Dealer has entered into a service agreement with Buell Distribution Company, LLC ("Buell Agreement"), Dealer hereby agrees that the Buell Agreement shall, at the option of Buell Distribution Company, LLC, terminate automatically and without further notice upon termination of this Contract for any reason, or on July 31, 2017, whichever occurs first.

**5. NOTICES.** Any notice required or permitted by this Contract or given in connection therewith shall, except as otherwise provided in this Contract, be in writing and shall be given by personal delivery, first class mail with postage prepaid, or overnight courier. Notices to Dealer shall be directed to Dealer at its current place of business; notices to Seller shall be directed to Seller at 3700 West Juneau Avenue, Milwaukee, Wisconsin 53208, or such other address as Seller shall direct from time to time.

**6. ACKNOWLEDGMENTS.** Dealer acknowledges that each of its responsibilities under this Contract is reasonable, proper and fundamental to the purpose of this Contract and that its failure to fulfill any of them would constitute a material breach. Dealer also acknowledges that any such failure, occurrence, event or default would constitute a reasonable, fair, good, due and just cause and provocation for termination or non-renewal of this Contract by Seller. The Contract shall not give rise to fiduciary duties by either party to the other. Dealer further acknowledges that no direct or indirect franchise fee or required payment has been paid by Dealer to Seller in connection with this Contract, including the "franchise" and related rights thereunder. Dealer further acknowledges that it is not intended to be, and that under no circumstances shall it be deemed to be, a third party beneficiary of any of the terms or provisions of any contract Seller may enter into with any other dealer.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 47 of 49 Document 1

**7. WAIVER.** The failure of either party to enforce at any time any of the provisions of this Contract, or to exercise any option which is herein provided or to require at any time performance by the other party of any of the provisions hereof, shall in no way be construed to be a waiver of such provisions, nor in any way to affect the validity of this Contract or any part thereof, or the right of the party to thereafter enforce each and every such provision.

**8. ENTIRE CONTRACT.** Except as explicitly agreed in this Contract, Seller has made no promises to Dealer, Dealer Operator or Owner(s) and there are no other agreements or understandings, either written or oral, between the parties affecting this Contract or relating to any of the subject matters covered by this Contract. Except as otherwise provided herein, this Contract supersedes and cancels all previous agreements between the parties that relate to any matters covered herein. No modifications, amendments or changes to this Contract, except as otherwise provided herein, shall be valid and binding unless made in writing and signed by both parties, it being agreed that this Contract and/or any modifications, amendments or changes thereto shall not be valid or binding against Seller unless signed by a Vice President or a Director of Seller.

**9. AMENDMENT.** Notwithstanding anything in this Contract to the contrary, Seller shall have the right, provided it exercises such right in good faith, to unilaterally amend, modify or change this Contract in case of legislation, government regulation or changes in circumstances beyond the control of Seller that might affect materially the relationship between Seller and Dealer.

**10. GOVERNING LAW.** This Contract has been signed by Dealer and sent to Seller in Milwaukee, Wisconsin for final approval and execution there and has been signed and delivered on behalf of Seller in Wisconsin. The parties intend this Contract to be executed as a Wisconsin agreement and to be construed in accordance with the laws of the State of Wisconsin, with the exception of Chapter 218 Wis. Stats. and any amendments or successor provisions thereto unless Dealer is a licensed motor vehicle dealer situated in the State of Wisconsin. Any applicable state motor vehicle statute governing the relationship between Dealer and Seller shall be controlling in the event of a conflict between any provision of this Contract and that state statute.

**11. SEVERABILITY.** If any provision of this Contract should be held invalid and unenforceable for any reason whatsoever or to violate any law of the United States, the District of Columbia or any state or territory, such provisions shall be deemed deleted from this Contract in such jurisdiction, and the remainder of this Contract shall be valid and enforceable without such provision.

**12. ASSIGNABILITY.** This Contract and/or the rights and duties hereunder cannot be assigned by Dealer in whole or in part without the prior written consent of Seller. This Contract and/or the rights and duties hereunder may be assigned in whole or in part by Seller at any time. This Contract is binding upon the heirs, successors and assigns of the parties hereto.

**13. HEADINGS.** Paragraph and other headings are for convenience of reference only and shall not constitute a part of or otherwise affect the interpretation of this Contract.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 48 of 49 Document 1

**14. PROTECTION OF CONSUMER DATA.**

**(a) CONSUMER INFORMATION RECEIVED FROM SELLER.** Seller may provide to Dealer individual consumer information, including names and addresses of consumers who have obtained Seller's products or services. Dealer agrees not to use or disclose any such consumer information obtained from Seller for any purpose other than to carry out its obligations under this Agreement. Dealer agrees that it shall maintain the security and confidentiality of all such consumer information. Dealer also agrees that all consumer information obtained from Seller is exclusive property of Seller. Upon the termination or expiration of this Agreement, Dealer shall promptly destroy all copies of such consumer information and cease using it for any purpose. Seller may establish policies from time to time to carry out the purposes and intent of this provision.

**(b) OTHER CONSUMER INFORMATION.** In order to ensure Dealer's compliance with law, Seller may establish policies from time to time regarding the collection, use, transfer, and disclosure of individual consumer information that is collected by Dealer or that Dealer receives from sources other than Seller. Dealer agrees to fully comply with any such policies.

Case 2:20-cv-00311-LA Filed 08/23/19 Page 49 of 49 Document 1