UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SEATTLE POWERSPORTS LLC, d/b/a
LAWLESS HARLEY-DAVIDSON OF
RENTON,

               Plaintiff,

     v.

HARLEY-DAVIDSON MOTOR
COMPANY INC., et al.,

               Defendants.

CASE NO. 2:19-cv-01339-RSL-BAT

**REPORT AND
RECOMMENDATION**

      Defendant Harley-Davidson Motor Company, Inc. ("HDMC") moves, pursuant to

Fed.R.Civ.P. 12(b)(6), to dismiss the complaint of Plaintiff Seattle Powersports, LLC, d/b/a

Lawless Harley-Davidson of Renton ("Renton").[1] Dkt. 26.

      Renton was a Harley-Davidson motorcycle dealer from 2013 through 2018 pursuant to a

HDMC Dealer Contract (the "Dealer Contract"). Dkt. 1, Exh. A. Renton alleges HDMC

intentionally failed to provide it with a reasonable supply of new motorcycle inventory contrary

to the terms of the Dealer Contract. Renton claims damages in the form of lost profits and

---

[1] Plaintiff refers to itself as "Renton" or "Plaintiff," while HDMC refers to Plaintiff as "Lawless."
The Court refers to Plaintiff as "Renton" as that is how Plaintiff refers to itself in the Complaint.

REPORT AND RECOMMENDATION- 1

decreased value of its dealership. Renton pleads breach of contract (Counts I and II), breach of the duty of good faith and fair dealing (Count III), violation of RCW 46.93.170 ("Washington's Motorsports Dealer Law") (Counts IV and V), unlawful and unfair practices under RCW 19.86 (Counts VI and VII), and promissory estoppel (Count VIII).

HDMC contends Renton's claims are barred by a Release, Waiver and Covenant Not to Sue (the "Release"), which is contained in an Assignment and Assumption Agreement (the "Assignment") signed by Renton when it sold its dealership. Alternatively, HDMC contends there are independent grounds to dismiss the claims, but if any claim survives this motion to dismiss, it should be transferred to the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1404(a).

Defendant Harley-Davidson Financial Services, Inc. ("HDFS") separately filed a motion to dismiss. Dkt. 25. In response to HDFS's motion, Plaintiff filed a notice of voluntary dismissal as to HDFS. Dkt. 30. Thus, HDFS is no longer a party to this action and its motion to dismiss is moot.

The undersigned recommends the Court **DENY** HDMC's motion to dismiss as to Counts I, II, and III and **GRANT** HDMC's motion to dismiss as to Counts IV, V, VI, VII, and VIII. Because the factors governing transfer of the allegations contained in Counts I, II and III weigh in favor of transfer, the Court further recommends that HDMC's motion to transfer this matter to the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1404(a) be **GRANTED**.

<u>FACTUAL ALLEGATIONS</u>

In December 2013, Renton acquired a Harley-Davidson motorcycle dealership and operated that dealership pursuant to the terms of the Dealer Contract. Dkt. 1, ¶ 9; ¶ 2; Exh. A. As part of the application process to become a Harley-Davidson dealer and before signing the

REPORT AND RECOMMENDATION- 2

Dealer Contract and obtaining financing from HDFS, Renton submitted to HDMC 5-year financial projections and pro forma. The projections were based on the assumptions that Renton would sell a certain number of motorcycles, increasing in each of the five years, and HDMC would provide a fair and consistent allocation of inventory. *Id.*, ¶¶ 10-11. Renton did not meet its projected sales because HDMC failed to allocate sufficient inventory to do so. *Id.*, ¶¶ 24-25, 32.

After Renton acquired the dealership, HDMC reduced Renton's volume of new motorcycles, which placed Renton in the untenable position of having to shoulder its financial obligations of operating the dealership with a smaller inventory. *Id.*, ¶¶ 20, 21, 22. HDMC's supply of new motorcycles to Renton did not come close the levels set forth in the pre-sale pro forma and the supply level decreased each year. *Id.*, ¶¶ 23-24. Although Renton had consumer demand for additional product and repeatedly requested additional new units from HDMC, HDMC failed to supply Renton with an adequate number of new motorcycles unless Renton agreed to sell the units for a higher price. *Id.*, ¶¶ 25, 31. HDMC intentionally decreased the supply of new inventory in a calculated effort to increase prices for new and used motorcycles and to increase the collateral loan value of motorcycles previously purchased and financed by customers through HDFS. *Id.*, ¶¶ 25-29.

Renton's purchase of the dealership and the lending it received from HDFS (90% of $3 million), were based on projected sales contained in the pro forma. However, HDMC's unilateral reduction of Renton's inventory supply and sales goals, and the removal of zip codes from Renton's sales territory, all made it impossible for Renton to sell enough inventory to cover its financial obligations, which in turn, caused it to sell the dealership for significantly less than it would have with the promised inventory. *Id.*, ¶¶ 30-38. HDMC had inventory available because

REPORT AND RECOMMENDATION- 3

it provided nearly 300 additional motorcycles to Lawless Powersports, LLC, d/b/a Lawless

Harley-Davidson of Scott City, after it purchased the dealership from Renton. *Id.*, ¶ 38.

Relevant provisions of the Dealer Contract referred to in the Complaint include:

Section A. PURPOSES AND OBJECTIVES
…Seller dedicates itself to the design, engineering, manufacture, marketing and supply of Harley-Davidson Products and services designed to achieve this purpose and to reflect these valued behaviors. Similarly, Dealer dedicates itself to serving the Harley-Davidson customer and ensuring that Harley-Davidson Products are sold and serviced in a manner that promotes the Harley-Davidson experience while increasing customer confidence and customer satisfaction.

Section B. SALES EFFORTS
Seller will assign Dealer a geographic area from time to time as Dealer's Territory, in which Dealer is responsible for effectively selling at retail, servicing and otherwise representing Harley-Davidson Products. It is understood and agreed that (a) Seller may modify, alter or adjust Dealer's Territory at any time, based on Seller's good faith business judgment; and (b) Dealer's Territory is non-exclusive. Without limitation, Dealer recognizes that Seller may change its Territory if the change results from the establishment of an additional Harley-Davidson dealership, the removal of an existing dealership, or the relocation of an existing dealership.

Section B.1. MOTORCYCLE SALES. Dealer agrees to cooperate with Seller in reviewing and planning Dealer's Harley-Davidson Motorcycle promotion and sales effort throughout each model year and further agrees to meet such Harley-Davidson Motorcycle sales objectives based upon market shares and other relevant criteria that Seller may reasonably establish for Dealer from time to time and which take into account Harley-Davidson Motorcycle availability.

Section B.2. MOTORCYCLE INVENTORY AND DEMONSTRATORS. Subject to availability from Seller, Dealer shall at all times maintain an inventory of current model Harley-Davidson Motorcycles in first class operating condition of a quantity and assortment as are in accordance with such reasonable guidelines as may be established by Seller for Dealer from time to time or which are adequate to meet Dealer's proper share of current and anticipated demand for Harley-Davidson Motorcycles in the Territory. Dealer understands that Seller may adopt and utilize sales and inventory management programs to allow Dealer and Seller to forecast Dealer's expected requirements for Harley-Davidson Motorcycles so as to enable Dealer to meet anticipated customer demand. Dealer shall cooperate with Seller in the implementation and operation of such programs throughout the model year in order to maximize the effectiveness of such programs.

REPORT AND RECOMMENDATION- 4

## Section C. ORDERS AND TERMS OF SALE.

Dealer shall submit orders for Harley-Davidson Products to Seller in such quantity and assortment as are necessary to fulfill Dealer's responsibilities under this Contract. All orders shall be submitted in such manner as required by Seller and shall be subject to acceptance in whole or in part by Seller at Milwaukee, Wisconsin. However, Dealer understands and agrees that Seller will not accept orders from Dealer for a specific retail customer. All orders for Harley-Davidson Products and services shall be subject to and governed exclusively by this Contract and any supplemental written terms and conditions of sale published by Seller from time to time for its dealers. This Contract and any supplemental terms and conditions of sale from Seller shall be the exclusive governing document, notwithstanding any different, new or additional terms and conditions set forth in Dealer's orders or other sales proposals.

**Section C.1. INITIAL MOTORCYCLE ORDER.** The quantity and assortment of such new Harley-Davidson Motorcycle models comprising Dealer's Initial Order shall be as determined by Seller, based upon its reasonable judgment…. Except for its motorcycle unit cancellations, any other revisions by Dealer to its Initial Order shall be subject to Seller's acceptance.

**Section C.2. BASIC MOTORCYCLE ORDER.** To enable Seller to plan for, establish and carry out Harley-Davidson Motorcycle production schedules effectively throughout each model year, Dealer shall, upon Seller's written request and pursuant to Seller's procedures then in effect, furnish Seller at the commencement of each model year a basic order for Harley-Davidson Motorcycles (referred to in this Contract as a "Basic Order"). The Basic Order shall be based upon Dealer's best estimate, in consultation with Seller, of Dealer's entire new Harley-Davidson Motorcycle needs for said model year. Seller shall determine the monthly quantities of Harley-Davidson Motorcycles offered to Dealer in various order phases throughout the model year to be applied against the Basic Order. Dealer agrees to amend its Basic Order, in consultation with Seller, so as to make prompt and adequate provision for any new model Harley-Davidson Motorcycles which may be introduced by Seller and offered for sale to Dealer following the commencement of the model year. All Harley-Davidson Motorcycle orders whatsoever submitted in writing by Dealer to Seller shall remain in effect unless canceled or changed by Dealer in whole or in part pursuant to Seller's written cancellation or change order procedures then in effect or unless canceled or changed by Seller in whole or in part upon notice to Dealer.

**Section C.6. FAILURE TO DELIVER.** Seller will endeavor, to the extent practicable considering all relevant factors, to produce and deliver to Dealer Harley-Davidson Products and services that are ordered by Dealer and which orders are accepted by Seller, and that are required in the fulfillment of Dealer's responsibilities under this Contract. However, Seller shall not be liable to Dealer in any respect for failure to ship or furnish or for delay in shipment or furnishing

REPORT AND RECOMMENDATION- 5

of Harley-Davidson Products and services where such failure or delay is due to (a) shortage or curtailment of materials, labor, transportation or utility services, (b) any labor or production difficulty in any of Seller's own or any of its suppliers' or subcontractors' locations, (c) any governmental action, (d) Acts of God or (e) any other cause beyond Seller's reasonable control or without Seller's direct fault or negligence. During any period of shortage of any Harley-Davidson Products or services due to any cause whatsoever, Seller shall have the exclusive right to allocate Harley-Davidson Products and services to Dealer and all other dealers and customers based upon such relevant criteria which Seller may establish in its discretion from time to time, notwithstanding anything herein to the contrary. Such criteria may include, but shall not be limited to, past sales performance by dealers, inventory levels, current and future sales potential of markets, economic forecasts, Seller's operating and strategic plans, government laws and regulations, and/or any other relevant criteria.

Section J.4. CAPITAL AND CREDIT REQUIREMENTS. Dealer recognizes that in order to properly fulfill its responsibilities under this Contract, it is necessary for Dealer to provide and maintain at all times sufficient net working capital and floor plan credit lines, the amount of which will depend upon the size of Dealer's operations as contemplated by this Contract. Based on its reasonable guidelines, Seller will establish for Dealer from time to time the minimum net working capital and floor plan credit line requirements for Dealer's operations, and Dealer agrees to meet said requirements.

Dkt. 1, Exh. A.

## LEGAL STANDARDS

A.   Rule 12(b)(6)

When considering a motion to dismiss under Rule 12(b)(6), the court construes the complaint in the light most favorable to the nonmoving party. *Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). Under Rule (8)(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 677-678, 129 S.Ct. 1937 (2009). This does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 678 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955 (2007). To survive a motion to dismiss, a complaint must state sufficient factual matter, accepted

REPORT AND RECOMMENDATION- 6

as true, to "state a claim to relief that is plausible on its face." *Id.* A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The *Twombly/Iqbal* standard is not a high one. *See Force v. Wright. Med. Tech., Inc.*, No. C12-5687RBL, 2012 WL 4897165, at *2 (W.D. Wash. Oct. 15, 2012); *Staub v. Zimmer*, No. C17-0508JLR, 2017 WL 2506166 at *2 (W.D. Wash. Oct. 15, 2012).

The court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *Wyler Summit Partnership v. Turner Broadcasting System, Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). A court may dismiss a complaint as a matter of law if it lacks a cognizable legal theory or states insufficient facts under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

B.    <u>Governing Law</u>

It is undisputed that the Dealer Contract controlling the relationship between Renton and HDMC contains a "Governing Law" section stating that any disputes are governed by "the laws of the State of Wisconsin":

> Section P.10. GOVERNING LAW. This Contract has been signed by Dealer and sent to Seller in Milwaukee, Wisconsin for final approval and execution there and has been signed and delivered on behalf of Seller in Wisconsin. The parties intend this Contract to be executed as a Wisconsin agreement and to be construed in accordance with the laws of the State of Wisconsin, with the exception of Chapter 218 Wis. Stats. and any amendments or successor provisions thereto unless Dealer is a licensed motor vehicle dealer situated in the State of Wisconsin. Any applicable state motor vehicle statute governing the relationship between Dealer and Seller shall be controlling in the event of a conflict between any provision of this Contract and that state statute.

Although Renton disagrees that Wisconsin law governs its contractual claims, it also states that "the outcome of the common law claims will be the same whether Washington or

REPORT AND RECOMMENDATION- 7

Wisconsin law applies." Dkt. 29 at 2, n.1. Thus, there is no conflict-of-law analysis for this Court to perform, and the language of the Dealer Contract controls. *See Carideo v. Dell, Inc.*, 520 F.Supp.2d 1241, 1244 (W.D. Wash. 2007) ("When parties dispute choice of law, there must be an actual conflict between the laws or interests of Washington and the laws or interests of another state before Washington courts will engage in a conflict of laws analysis.") (quoting *Erwin v. Cotter Health Ctrs., Inc.*, 161 Wn.2d 676, 167 P.3d 1112 (2007)). Thus, the Court will apply the laws of the State of Wisconsin to Renton's non-statutory claims.

Renton's statutory claims under Washington's Dealer Act, RCW 46.93.170, exist "notwithstanding the terms of a franchise agreement." The Dealer Contract states that "[a]ny applicable state motor vehicle statute governing the relationship between Dealer and Seller shall be controlling in the event of a conflict between any provision of this Contract and that state statute." Dkt. 1, ¶ 48.

<u>JUDICIAL NOTICE</u>

HDMC asks the Court to take judicial notice of SEC filings evidencing the relationship between the defendants (HDMC and HDFS) and of an assignment signed by Renton when it sold the dealership on November 13, 2018. Dkt. 26, n.2; Dkt. 26, Exh. A.

In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir.2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). A court must normally convert a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment if it "considers evidence outside the pleadings.... A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the

REPORT AND RECOMMENDATION- 8

motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir.2003).

Rule 201 of the Federal Rules of Evidence, which governs judicial notice, states in part: "A judicially noticed fact must be one not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). "On a motion to dismiss, the Court may take judicial notice of SEC filings. *See*, *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (affirming district court's consideration of SEC filings on a motion to dismiss)." *In re F5 Networks, Inc.*, No. C06-794RSL, 2007 WL 2253382 at *1 (W.D. Wash. Aug. 1, 2007). In light of this authority and the fact Renton does not oppose judicial notice of the SEC filings, the Court grants HDMC's motion with respect to the SEC documents referred to by HDMC (Dkt. 26, n.2), evidencing that HDMC, HDFS, and Harley-Davidson Credit Corporation ("HDCC") are affiliated entities, but not subsidiaries of each other.

HDMC also ask the Court to take judicial notice of release language (the "Release") contained in an Assignment and Assumption Agreement between Renton, HDCC, Eaglemark Savings Bank, and Lawless Powersports, LLC (the purchaser of the Renton dealership) ("the Assignment"). HDMC argues that the Release requires the Court to dismiss the complaint in its entirety as a matter of law. Dkt. 26 at 10-11. HDMC relies in particular, on the following language: "[Renton] hereby waives, releases, agrees not to sue, and forever discharges HDCC, ESB *and their affiliates*…by any matter, cause or thing *whatsoever related to this Agreement*, the Loans, amounts and terms outlined in the attached exhibits or any other documents, related

REPORT AND RECOMMENDATION- 9

transactions, relationships, acts or omissions *from the beginning of time* to the date of this Agreement." Dkt. 26, Ex. A at 4, § 21 (emphases added).

HDMC contends that, as an affiliate of HDCC, the Release applies to it and further, that the Release applies to the Dealer Contract between HDMC and Renton because the purpose of the Assignment was to permit the sale of the dealership operated under the Dealer Contract. Dkt. 31 at 3. Although the Assignment is neither referred to nor attached to Renton's complaint, HDMC argues that the Court may consider its terms because Renton alleges it was harmed through the sale of its dealership and therefore, all documents executed as part of that sale "are integral to this dispute." Dkt. 26 at 11, n. 3.

"A court may consider exhibits attached to a complaint, . . . as well as document[s] the authenticity of which [are] not contested, and upon which the plaintiff's complaint necessarily relies[,] even if they are not attached to the complaint." *Kimbro v. Miranda*, 735 F. App'x 275, 278 n.2 (9th Cir. 2018) (internal quotations and citations omitted). "The purpose of this rule is to prevent plaintiffs 'from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents' that are determinative of their claims.") (quoting *Parrino v. FHP, Inc.,* 146 F.3d 699, 706 (9th Cir. 1998*) superseded by statute on other grounds, as noted in Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681 (9th Cir. 2006)). Dkt. 26, p. 5 n. 3.

The financing agreements made the subject of the Assignment (and exhibits and documents related to them) were not filed with the Court, so a complete determination of how or if the Assignment and Release relate to the Complaint is not possible. The Court notes however, that the Complaint does not rely on the Assignment nor does it appear the Assignment is in fact, determinative of Renton's claims. The sale of the dealership is not the subject of Renton's complaint. Renton's claims stem from the franchise relationship established by the Dealer

REPORT AND RECOMMENDATION- 10

Contract between Renton and HDMC and the harm claimed by Renton is alleged to have been caused by HDMC's breaches of the Dealer Contract. Renton does not allege wrongdoing with the sale of the dealership. Moreover, by its terms, the scope of the Assignment is limited to the assignment of three motorcycle inventory financing agreements (originally between Renton, HDCC, and ESB) to the purchaser of the dealership.

The Complaint does not explicitly rely on the Assignment or the financing agreements being assigned as a basis for any claim, and the contents of these documents are not particularly alleged in the complaint. Although the parties do not appear to dispute the authenticity of the Assignment, the parties do dispute its relevance. Thus, the Assignment (and Release contained therein) is not properly subject to judicial notice and will not be considered at this stage of the litigation. Were the Court to consider this extrinsic evidence, it would in fact convert the motion to dismiss into a motion for summary judgment, which the Court is not willing to do.

<u>DISCUSSION</u>

A.    <u>Breach of Contract – Counts I and II</u>

"When construing contracts that were freely entered into, [the] goal is to ascertain the true intentions of the parties as expressed by the contractual language." *Betz v. Diamond Jim's Auto Sales*, 355 Wis.2d 301, 320, 849 N.W.2d 292 (2014) (quotation marks omitted). "In ascertaining the intent of the parties, contract terms should be given their plain or ordinary meaning." *Id*. (quotation marks omitted). "[U]nder Wisconsin law, which governs Renton's contractual claims, … the interpretation of an unambiguous contract constitutes a question of law." *Abraham v. Wash. Grp. Int'l*, 766 F.3d 735, 739 (7th Cir. 2014).

In Count I, Renton alleges that HDMC's failure to supply inventory sufficient to meet customer demand constituted a breach of Sections A, B, and C of the Dealer Contract. Pursuant

REPORT AND RECOMMENDATION- 11

to those sections, the parties agreed to work together to meet consumer demand for the purchase of new Harley-Davidson motorcycles from Renton. Dkt. 1, ¶ 40. However, HDMC failed to provide the supply necessary for Renton to viably operate its business. *Id.* HDMC knew what was necessary for Renton to operate its business because, when it approved Renton as a Harley-Davidson dealer, HDMC reviewed Renton's plan of operations as set forth in its pro forma. Despite this knowledge, HDMC reduced Renton's inventory below the demand in Renton's territory and below that which was needed for Renton to comply with the Dealer Contract. *Id.*, ¶ 41, 42. When HDMC unilaterally reduced Renton's inventory supply, HDMC breached its obligation to supply inventory sufficient to allow Renton to achieve the purpose of, and to meet its obligations under, the Dealer Contract. HDMC's actions also damaged the value of the dealership. *Id.*, ¶¶ 43.

In Count II, Renton alleges that HDMC's reduction in the supply of new motorcycles directly impacted Renton's ability to comply with Section J(4) of the Dealer Contract, which required Renton to "at all times maintain sufficient net working capital and floor plan credit lines" in the operation of its business. HDMC was required under the Dealer Contract to produce and deliver to Renton products and services ordered by Renton and that were required in the fulfillment of Renton's responsibilities under the Dealer Contract. Dkt. 1, ¶¶ 44-46. HDMC was aware how many new unit sales were required for Renton to successfully maintain its business operations, as this information was presented directly to HDMC before HDMC approved Renton's purchase of the dealership and authorized it as a Harley-Davidson dealer. *Id.*, ¶ 47.

Renton also alleged that its ability to maintain working capital was diminished by the reduction in supply because it had to use its working capital to fund dealership operations. HDMC's actions caused damage to Renton through the reduction of revenue and lost profits, by

REPORT AND RECOMMENDATION- 12

placing its franchise operations in jeopardy due to the inability to meet the capital and floor plan credit requirements to the point it was necessary to sell its franchise, and by reducing the value of the franchise. Dkt. 1, ¶¶ 44-49.

HDMC argues that Renton has failed to state a claim for breach of contract by the allegations in Counts I and II because (1) the Dealer Contract gives HDMC complete discretion to allocate motorcycles, and (2) the parties agreed forecasts of Plaintiff's motorcycle sales (the pro forma submitted with the dealership application) are communications that cannot be considered given the integrated language of the Dealer Contract. Dkt. 26 at 15-17.

1.  Discretion to Allocate Inventory

HDMC argues that the Dealer Contract expressly granted it the right to exercise discretion in motorcycle allocation and thus, all that is alleged is the exercise of HDMC's contractual rights. Dkt. 31 at 5. According to HDMC, that discretion is set forth in Sections C and C.1 of the Dealer Contract, which states "[a]ll orders . . . shall be subject to acceptance in whole or in part by Seller," (Dealer Contract, § C), with the "quantity and assortment" of an initial order "determined by [HDMC]," (*id*. at § C.1), and where HDMC "shall determine the monthly quantities of Harley-Davidson Motorcycles offered to [Renton] in various order phases throughout the model year." (*Id*. at § C.2.).

The Complaint alleges however, that the express terms of the Dealer Contract impose reasonable bounds to HDMC's discretion. For example, the Dealer Contract states that Renton would maintain an inventory adequate to meet its proper share of current and anticipated demand in the Territory and HDMC would adopt inventory management programs to forecast and to enable Renton to meet anticipated customer demand and fulfill its responsibilities under the Dealer Contract (such as maintaining the minimum net working capital and floor credit line

REPORT AND RECOMMENDATION- 13

requirements that were established by HDMC). Dkt. 1, Ex. A, B.2, C.6., J.4. Renton alleges that HDMC breached this contractual obligation when it failed to consider the current and anticipated demand of motorcycles in Renton's territory (or at least failed to follow reasonable guidelines for making this determination). Dkt. 1, ¶¶ 15-19, 39-49. *See also* Dkt. 1, Exh. A, Subs. 6 (explaining limited situations where HDMC would not be liable to Dealer for failure to ship or furnish, including situations such as labor shortages, governmental actions, and "acts of God.")

2. <u>Pro Forma</u>

HDMC also argues that evidence of the pro forma submitted with Renton's franchise application cannot be considered as the Dealer Contract is an integrated contract constituting the complete agreement of the parties notwithstanding new, additional, or different terms set forth in other sales proposals. Section P.8 of the Dealer Contract provides that the Dealer Contract supersedes and cancels all previous agreements between the parties that relate to any matters covered therein:

> Section P.8. ENTIRE CONTRACT. Except as explicitly agreed in this Contract, Seller has made no promises to Dealer, Dealer Operator or Owner(s) and there are no other agreements or understandings, either written or oral, between the parties affecting this Contract or relating to any of the subject matters covered by this Contract. Except as otherwise provided herein, this Contract supersedes and cancels all previous agreements between the parties that relate to any matters covered herein. No modifications, amendments or changes to this Contract, except as otherwise provided herein, shall be valid and binding unless made in writing and signed by both parties, it being agreed that this Contract and/or any modifications, amendments or changes thereto shall not be valid or binding against Seller unless signed by a Vice President or a Director of Seller.

It is well-established that an integration clause, in conjunction with the parol evidence rules, bars the introduction of extrinsic evidence to vary or contradict the terms of a writing. The parol evidence rule is substantive law that bars evidence of any prior written or oral agreement from varying or contradicting the terms of the writing when the parties intend the written

REPORT AND RECOMMENDATION- 14

agreement to be the final expression of their agreements. *Town Bank v. City Real Estate Development, LLC,* 2009 WI App 160, ¶ 11, 322 Wis. 2d 206, 217–18, 777 N.W.2d 98, 104, *aff'd*, 2010 WI 134, ¶ 11, 330 Wis. 2d 340, 793 N.W.2d 476 (and cases cited therein). "The real question when a party invokes the parol evidence rule is whether the parties intended the written agreement to be final and complete or "integrated" or whether they intended any prior agreements to be part of their total agreement. *See id.* at 157, 250 N.W.2d 362.

In Counts I and II, Renton alleges that the conduct of HDMC violated specific provisions of the Dealer Contract, *i.e.*, Sections A-C and J. For example, Renton alleges that the Dealer Contract required the parties to cooperate in determining reasonable sales objectives which take motorcycle availability into account. Thus, regardless of the pro forma, Renton has stated a claim for breach of the Dealer Contract.

Renton also alleges that HDMC was aware of what Renton required to maintain a financially viable dealership because it required Renton to provide the pro forma as part of its franchise application before HDMC would approve Renton as a dealer. *See* Dkt. 1, ¶¶ 9-12 (Renton proposed, and HDMC reviewed and approved, various applications and forms as part of the dealership acquisition process); (one of the requirements was a "pro forma" business plan describing Renton's plan of operations, including sales volumes (and associated revenue) for the dealership, and this was the foundation of Renton's dealership acquisition proposal); (the pro forma demonstrated the financial basis for its willingness to acquire the dealership as well as what level of sales were required to operate the franchise viably).

Because the Dealer Agreement specifically requires HDMC to consider factors such as past and present consumer demand and the ability of the dealer to achieve its contractual obligation (Exh. A, Sec. C; Subs. 6; Sec. J), it is not clear that the pro forma are in fact,

REPORT AND RECOMMENDATION- 15

contradictory to HDMC's contractual promise to supply Renton with the inventory necessary to meet the other requirements of the Dealer Contract. In addition, the Dealer Contract itself refers to and incorporates by reference other writings such as the "Dealer Ownership Policy," which in turn, refers to the type of information needed to successfully become a HDMC dealer. *See*, *e.g.* Dkt. 1, Exh. A, ¶ L.1 referring to the standards for approval of a sale of a HDMC dealership: "proposed owner or dealer operator" must "accept and comply with [HDMC's] dealer contract *or with its Dealer Ownership Policy*" and must "meet Seller's standards for capital or financial capability, personal qualifications, business experience or the onsite/actively involved in the dealership operations requirements of the Dealer Ownership Policy."

Viewing these facts in the light most favorable to Renton, as the Court must do on a motion to dismiss, the undersigned finds that Renton has sufficiently plead breach of the Dealer Contract and recommends that HDMC's motion to dismiss Counts I and II be denied.

B.    Breach of Duty of Good Faith and Fair Dealing

Renton alleges that HDMC violated the implied duty of good faith and fair dealing when it unilaterally reduced Renton's supply of new motorcycles to a level substantially below what was necessary for Renton to operate its business.

"'Every contract implies good faith and fair dealing between the parties to it.' [Thus,] 'compliance in form, not in substance' breaches that covenant of good faith." *Bozzacchi v. O'Malley*, 211 Wis.2d 622, 626, 566 N.W.2d 494, 495 (Ct.App.1997) (citations omitted); Restatement (Second) Contracts § 205 (1981). Although the covenant of good faith and fair dealing that is implied in all contracts "cannot override" a contract's "express" terms, obligations under those terms must be performed subject to that implied covenant, *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 690 A.2d 575, 586–587 (1997), and "a party may be liable for breach

REPORT AND RECOMMENDATION- 16

of the implied contractual covenant of good faith even though all the terms of the written agreement may have been fulfilled," *Foseid v. State Bank of Cross Plains*, 197 Wis.2d 772, 796, 541 N.W.2d 203, 212 (Ct.App.1995). *See also*, *Estate of Chayka*, 47 Wis.2d 102, 107, 176 N.W.2d 561, 562 (1970) (although the contract had been fully complied with "in form," the party's action "breache[d] the duty of good faith that accompanies every contract, by accomplishing exactly what the agreement of the parties sought to prevent). It is ordinarily a question of fact whether a party to a contract has breached its obligations of good faith and fair dealing. *See Amoco Oil Co. v. Capitol Indemnity Corp.*, 95 Wis.2d 530, 542, 291 N.W.2d 883, 890 (Ct.App.1980).

HDMC argues that this claim should be dismissed because (1) Renton cannot use the duty of good faith, separately or in conjunction with the superseded dealer application pro forma, to "creat[e] rights not expressly included in the contract" and (2) Renton cannot use the duty of good faith to bring a claim when the allegations reveal nothing more than HDMC's exercise of its express contractual rights (*i.e.*, HDMC had full discretion to determine the amount of inventory it sent to Renton).

Regarding HDMC's first contention and as previously noted, Renton alleges that the language of the Dealer Contract specifically placed limitations on HDMC's discretion as to the amount of inventory it needed to send to Renton, *i.e.*, Section A of the franchise provides that HDMC "dedicates itself to the … supply of Harley Davidson Products and services designed to achieve this purpose." The Agreement also requires HDMC to deliver to Renton, motorcycles requested by Renton in quantities "that are required in the fulfilment of the Dealer's responsibilities under this Contract." Dkt. 1, Ex. A, § C(6). Thus, Renton has sufficiently alleged breach of contractual rights expressed within the Dealer Contract.

REPORT AND RECOMMENDATION- 17

Regarding HDMC's second contention, it is well-established under Wisconsin law that when a plaintiff complains of nothing more than the exercise of express contractual rights, a claim for breach of the duty of good faith fails. *See e.g.*, *Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.*, 146 Wis.2d 568, 577, 431 N.W.2d 721 (Ct. App. 1988). ("[I]t would be a contradiction in terms to characterize an act contemplated by the plain language of the parties' contract as a 'bad faith' breach of the contract."); *Van Nuys Cycle, Inc. v. Harley-Davidson Motor Co.*, 679 F. App'x 542, 543 (9th Cir. 2017) (dealer contract provided HDMC could modify, alter, or adjust dealer's territory at any time, based on its good faith business judgment).

Renton acknowledges that the Dealer Contract vests HDMC with some discretion in the distribution of inventor but alleges HDMC breached the duty of good faith and fair dealing (and prevented Plaintiff from realizing the full benefit of the parties' bargain) by not providing sufficient inventory to meet customer demand and allow Renton to operate a financially viable dealership. While HDMC is the sole supplier of new Harley-Davison motorcycles to its dealers, decides how many motorcycles to build annually, and decides how to distribute those motorcycles to its dealers (Dkt. 1, ¶ 22), Renton alleges that the Dealer Contract imposed an obligation on HDMC to deliver to Renton when requested, inventory in quantities "that are required in fulfillment of Dealer's responsibilities under this Contract." *Id.*, ¶ 40, *citing* Exh. A, Secs. A, B, and C. Renton also alleged that HDMC ignored these contractual obligations and decided to lower Renton's product supply, not based on reasonable criteria (such as a decrease in motorcycle demand in Renton's market) but based on its own individual goal to lower supply to increase the value of its brand. Dkt. 1, ¶¶ 15-19, 39-49.

Whether HDMC's allocation of product to Renton was determined in bad faith is a question of fact, which is in dispute and cannot be determined at this stage of the litigation.

REPORT AND RECOMMENDATION- 18

1    Accordingly, the undersigned recommends that HDMC's motion to dismiss Count III of the

2    Complaint be denied.

3    C.     Count IV Violation of § 46.93.170(1)(d)

4           Section 46.93.170(1)(d) of Washington's Motorsports Dealer Law makes it unlawful for

5    a manufacturer to "[d]iscriminate between dealers by adopting a method, or changing an existing

6    method, for the allocation, scheduling, or delivery of new motorsports vehicles, parts, or

7    accessories to its dealers that is not fair, reasonable, and equitable." HDMC argues that a claim

8    for violation of Section 46.93.170(1)(d) requires factual allegations of an unfair, unreasonable

9    and inequitable allocation method that discriminates *between* dealers, while Renton argues that

10   the unfair, unreasonable, and inequitable allocation method *is* the discrimination.

11          When interpreting a statute, a court's first step is to "determine whether the language at

12   issue has a plain and unambiguous meaning ...." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340,

13   117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Where the statutory language is unambiguous, the

14   court's inquiry is at an end. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, ––– U.S. –––, 138 S.Ct. 617,

15   631, 199 L.Ed.2d 501 (2018) (when the plain language is "unambiguous, our inquiry begins with

16   the statutory text, and ends there as well") (internal quotation marks and citations omitted). "The

17   plainness or ambiguity of statutory language is determined by reference to the language itself,

18   the specific context in which that language is used, and the broader context of the statute as a

19   whole." *Robinson*, 519 U.S. at 341, 117 S.Ct. 843 (citations omitted).

20          The language of Section 46.93.170(1)(d) is plain and unambiguous, *i.e.*, it prohibits a

21   manufacturer from discriminating *between* dealers. This is consistent with the codified intent of

22   the dealer law, *i.e.*, "the maintenance of fair competition *among* dealers." RCW 46.93.010

23   (emphasis added).

REPORT AND RECOMMENDATION- 19

Renton alleges that HDMC unilaterally reduced its allocation of motorcycles to all its dealers in order to inflate the prices of used Harley-Davidson motorcycles. These actions were allegedly unfair, unreasonable, and inequitable to Renton because HDMC was aware of Renton's specific proposals and need for a greater supply of motorcycles to successfully run its dealership. Dkt. 1, ¶¶ 57-61.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Accepting the allegations of the Complaint as true and interpreting them in the light most favorable to Renton, the Court concludes that Renton has failed to allege facts giving rise to a violation of § 46.93.170(1)(d). It may be reasonably inferred from the factual allegations of the Complaint that HDMC changed its method for allocating its motorcycles (which it uniformly applied to all its dealers), and that this new method was unfair, unreasonable, and inequitable *as applied* to Renton (because HDMC was aware of Renton's specific needs). However, it cannot be reasonably inferred from the facts plead that this changed allocation method resulted in discrimination *between* dealers.

In its response to the motion to dismiss, Renton argues that "on information and belief," HDMC gave "enough inventory to other dealers for them to succeed," and that discovery of HDMC's allocation records will show that HDMC had other bikes to distribute and gave enough inventory to other dealers for them to succeed. Dkt. 29 at 19. In a motion to dismiss however, the Court must rely on the words in the Complaint and the Complaint does not allege that HDMC discriminated *between* its dealers. While a party may need additional discovery to flesh out the details and obtain evidence of a disputed factual allegation, discovery is not for finding the facts needed to state a claim. *See e.g.*, *Inst. for Wildlife Prot. v. Norton*, 337 F.Supp.2d 1223, 1226

REPORT AND RECOMMENDATION- 20

1   (W.D. Wash. 2004) ("To maintain an action in federal court, an actual case or controversy must

2   exist, and discovery may not be used to conduct a fishing expedition in hopes that some fact

3   supporting an allegation will be uncovered."); *Iqbal*, 556 U.S. at 678-79 ("Rule 8 [requiring a

4   "short and plain" statement of a claim] … does not unlock the doors of discovery for a plaintiff

5   armed with nothing more than conclusions.")

6          Accordingly, the undersigned recommends that HDMC's motion to dismiss Count IV be

7   granted as Renton has failed to allege a violation of RCW § 46.93.170(1)(d).

8   D.     Count V (Violation of § 46.93.170(1)(e))

9          Section 46.93.170(1)(e) of Washington's Motorsports Dealer Law makes it unlawful for

10  a manufacturer to "[g]ive preferential treatment to some dealers over others by refusing or failing

11  to deliver, in reasonable quantities and within a reasonable time after receipt of an order, to a

12  dealer holding a franchise for a line or make of motorsports vehicles sold or distributed by the

13  manufacturer, a new vehicle, parts, or accessories, if the vehicle, parts, or accessories are being

14  delivered to other dealers."

15         With regard to this claim, Renton alleges that HDMC failed to provide it reasonable

16  quantities of new motorcycles even though it provided "reasonable quantities to other dealers in

17  the state" and that there is no dispute that HDMC had sufficient inventory, because HDMC was

18  able to provide additional units in "limited circumstances and it is believed that HDMC provided

19  over hundreds of additional motorcycles" to the purchaser of Renton's franchise. Dkt. 1, ¶¶ 64-

20  65.

21         In its response, Renton clarifies that the allegation regarding the extra allocation to the

22  purchaser of its franchise was merely to make clear that Renton knows HDMC had extra

23  allocation which it chose not to supply to Renton. Renton also argues that it is alleging, "on

REPORT AND RECOMMENDATION- 21

information and belief" that HDMC is providing motorcycles to other dealers in adequate quantities while failing to provide the same to Renton because it cannot provide HDMC's inventory records (but it expects to obtain such in discovery). Dkt. 29 at 20.

The allegation that HDMC provided "*reasonable quantities* of new Harley-Davidson motorcycles *to other dealers* in the state," is vague and conclusory. Renton fails to allege facts supporting what constitutes "reasonable quantities" and does not identify the "other dealers," allegations which would allow the Court to reasonably infer that HDMC engaged in preferential treatment of the "other dealers." As previously noted, to survive a motion to dismiss, Renton must allege more than conclusions and must do more than merely recite the statutory language. Accordingly, the undersigned recommends that HDMC's motion to dismiss Count V be granted as Renton has failed to allege a violation of RCW § 46.93.170(1)(e).

E.    Count VI (Unlawful and Unfair Practices – RCW 19.86)

Washington Code Section 46.93.170(4) provides that a violation of Section 46.93.170 "is deemed to affect the public interest and constitutes an unlawful and unfair practice under chapter 19.86 RCW." Renton alleges HDMC's actions set forth in Counts IV and V are *prima facie* unlawful and unfair practices under 19.86 RCW as provided by Section 46.93.170(4). Dkt. 1, ¶ 68. Renton also acknowledges that dismissal of Counts IV and V require dismissal of Count VI. Dkt. 29 at 21. Therefore, it is recommended that the Court grant HDMC's motion to dismiss Count VI.

F.    Count VII (Unlawful and Unfair Practices Against HDMC and HDFS – 19.86 RCW)

Renton has dismissed HDFS from these claims and states that any mention of HDMC in Count VII was merely as foundation upon which to reach HDFS under RCW 19.86. To that extent, Plaintiff acknowledges that the dismissal of HDFS from this suit renders Count VII

REPORT AND RECOMMENDATION- 22

1  duplicitous to Count VI. Dkt. 29 at 21. Accordingly, the undersigned recommends that HDMC's

2  motion to dismiss Count VII be granted.

3  G.    Count VIII (Promissory Estoppel)

4      Renton alleges that HDMC "[i]n approaching Renton to purchase its franchise and

5  entering into its agreement with Renton," promised to "reasonably supply Renton with inventory

6  necessary to meet the requirements of its contract" and that HDMC knew "that Renton would

7  rely on this promise as evidenced by the pro-forma and other operations forecast which HDMC

8  reviewed and approved when agreeing to Renton's purchase of the franchise." Dkt. 1, ¶¶ 81-82.

9      HDMC alleges that Plaintiff cannot bring a claim for promissory estoppel when the

10  promise is followed by an integrated contract in direct conflict with the promise. Dkt. 26, pg. 18.

11      The doctrine of promissory estoppel was adopted by Wisconsin in *Hoffman v. Red Owl*

12  *Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267 (1965). The doctrine provides that a promise may

13  be specifically enforced or subject the promisor to damages:

14          (1) when that promise is one which the promisor should reasonably expect to
           induce action or forebearance of a definite and substantial character on the part of
15          the promisee, (2) when the promise does induce such action or forebearance, and
           (3) when injustice can be avoided only by enforcement of the promise.
16
  *Kinn v. Coast Catamaran Corp.*, 582 F.Supp. 682, 686-6877 (E.D.Wis. 1984). The rationale for

17  the doctrine of promissory estoppel "simply disappears when the parties finally enter into a

18  contract." "After all, there would be no need for the doctrine if an action for breach or specific

19  performance of a contract could be brought." *Durkee v. Goodyear Tire & Rubber Co.*, 676

20  F.Supp. 189, 191 (W.D. Wisconsin 1987) (applying Wisconsin law).

21      In response, Renton argues that while the Dealer Agreement is an integrated contract, it

22  fails to embody the total business relationship of the parties by failing to adequately address the

23

REPORT AND RECOMMENDATION- 23

issue of supplying inventory to Renton. Further, Renton argues that although supply of inventory is addressed in the written agreement (*see* Dkt. 1, Ex. A, §§ A, B.2, C, C.2, C.3 and C.6), the information contained is scattered, ambiguous, and ultimately not contradictory to the pro forma and corresponding promises by HDMC to supply Renton with the inventory necessary to meet the other requirements of its contract. Dkt. 29, at 21-22.

Renton's breach of contract claims (Counts I and II) are predicated on allegations that HDMC's discretion to allocate motorcycles was limited by the terms of the Dealer Contract and its allocation of motorcycles to Renton breached specific provisions of the Dealer Contract. Renton's argument that the issue of motorcycle allocation is not "embodied" by the Dealer Contract is therefore, contracted by and is incompatible with these claims. Renton's reliance on *Kramer v. Alpine Valley Resort, Inc.*, 108 Wis.2d 417, 321 N.W.2d 293 (1982) for the proposition that the Dealer Contract failed to embody the entire business relationship of the parties is unavailing. In *Kramer*, the contract executed by the parties represented a minor aspect of a larger business relationship whereas here, there are no allegations of a larger business relationship between Renton and HDMC outside that described in the Dealer Contract.

Motorcycle allocation (and whether HDMC's discretion to allocate is limited) is controlled by the terms of the Dealer Contract and the Dealer Contract itself makes clear that it is integrated. Thus, the promissory estoppel claim fails as a matter of law. *Hill Ins. Co. v. ITT Life Ins.*, 105 Wis.2d 760, 317 N.W.2d 511 (Ct. App. 1981) ("The merger clause in the [Dealership] Contract precludes [Lawless'] promissory estoppel claim."). Accordingly, it is recommended that HDMC's motion to dismiss Renton's promissory estoppel claim (Claim VIII) be granted.

//

//

REPORT AND RECOMMENDATION- 24

HDMC moves the transfer any claims remaining after the Court adjudicates its motion to dismiss to the Eastern District of Wisconsin. Dkt. 26 at 25-26. In support, HDMC provides the Declaration of Bill Kulow, Manager, Dealer Development for HDMC. Dkt. 27. In response, Renton argues against a transfer but submits no evidence (*e.g.*, a declaration under penalty of perjury) in opposition.

"Under [28 U.S.C.] § 1404(a), the district court has discretion to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (internal quotations omitted). In the Ninth Circuit, courts consider a non-exhaustive list of eight factors:

> A motion to transfer venue under § 1404(a) requires the court to weigh multiple factors in its determination whether transfer is appropriate in a particular case. For example, the court may consider: (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof.

*Id*. at 498-99. The court may consider evidence outside the complaint to decide a motion to transfer venue. *See Washington Public Utilities Group, et al. v. United States District Court for the Western District of Washington*, 843 F.2d 319, 327 (9th Cir. Dec. 2, 1987) (finding there was "sufficient evidence in the record" supporting a factor in a motion for transfer venue); *Doe v. Project Fair Bid Inc.*, No. C11-809 MJP, 2011 WL 3516073 at *5 (W.D. Wash. Aug. 11, 2011) (granting the transfer motion and noting Plaintiff "has submitted no evidence (*e.g*., a declaration under penalty of perjury)" in opposition to the motion). *See also*, *Hamad v. Gates*, No. C10-591

REPORT AND RECOMMENDATION- 25

MJP, 2010 WL 4511142, at *8 (W.D.Wash. Nov. 2, 2010) ("Without supporting affidavits or other evidence . . . the Court cannot 'assume'" any evidentiary support.).

    1.    <u>Location of Negotiation and Execution of Contract</u>

The first factor favors venue in the location where the agreement was negotiated and executed. *Ahead, LLC v. KASC, Inc.*, No. C13- 0187 JLR, 2013 WL 1747765 at * 6 (W.D. Wash. Apr. 23, 2013).

  The Dealer Contract was negotiated and executed in Milwaukee, Wisconsin, where HDMC is located. Dkt. 1, Exh. A, Dealer Contract at § P.10 ("This Contract has been signed by Dealer and sent to Seller in Milwaukee, Wisconsin for final approval and execution there and has been signed and delivered on behalf of Seller in Wisconsin."). Renton argues that the agreement was "negotiated outside of Wisconsin" (Dkt. 29 at 23) but provides no evidence or explanation of when and where negotiations took place. Renton also argues that "this lawsuit arises from its operation of a Harley-Davidson dealership in Washington." *Id.* at 24. However, Renton's claims are premised primarily on HDMC's motorcycle allocation decisions, which were made by HDMC in Wisconsin. Thus, this factor weighs in favor of transfer to Wisconsin.

    2.    <u>State Most Familiar With Governing Law</u>

The Dealer Contract contains a choice of law (Wisconsin) that was contractually agreed upon by the parties. "[W]hen parties specifically agree on contractual choice of law provisions, courts have concluded that these provisions favor transfer." *Ahead, LLC.*, 2013 WL 1747765 at *10.

As previously discussed, Renton's non-statutory claims are governed by Wisconsin law. Although Renton's statutory claims are governed by Washington law, it is recommended herein that those claims be dismissed. If the Court does not dismiss Renton's statutory claims, it is well

REPORT AND RECOMMENDATION- 26

established that "federal courts are equally equipped to apply distant state laws when the law is not complex." *Nat'l Prods. v. Wireless Accessory Sols., LLC*, No. C15-2024JLR, 2018 WL 1709494 at *4 (W.D. Wash. Apr. 9, 2018).

Renton's reliance on *Cycle City, Ltd. v. Harley-Davidson Motor Co.*, 81 F.Supp.3d 993, 1000 (D. Haw. 2013), is inapposite because that case involved enforcement of a contractual forum-selection clause (not a choice of law clause) that pointed to a state court (the motion here is for transfer to a federal court, so the forum non conveniens analysis is not applicable), and a governing statute that mandated venue in the dealer's state where the forum selection clause at issue was permissive (also not applicable here).

This factor weighs in favor of transfer to Wisconsin.

3.     Plaintiff's Choice of Forum

The third factor weighs against transfer because Renton chose a Washington forum. This factor is generally given significant weight when the plaintiff resides in the chosen forum. *Warfield v. Gardner*, 346 F.Supp.2d 1033, 1044 (D.Ariz.2004); *Williams v. Bowman*, 157 F.Supp.2d 1103, 1006 (N.D.Cal.2001). However, the degree to which courts defer to the plaintiff's chosen venue is substantially reduced where the plaintiff's venue choice lacks a significant connection to the activities alleged in the complaint. *Carolina Cas. Co. v. Data Broadcasting Corp.*, 158 F.Supp.2d 1044, 1048 (N.D.Cal.2001).

Although Renton appears to have no current or ongoing contacts with Washington since it sold the dealership and its owner does not live in Washington, it was operating as a licensed Washington motorsports dealer and its claims arose while it was operating that dealership in the state of Washington. Accordingly, this factor is found to weigh against transfer.

REPORT AND RECOMMENDATION- 27

4.    <u>Parties' Contact With The Forum</u>

The fourth factor focuses on the parties' contacts with either forum. According to HDMC's evidence, its contacts with Wisconsin are manifest. Dkt. 27, Kulow Decl., ¶ 9. On the other hand, Renton's contacts with Washington ended when it sold the dealership in Renton. In addition, Renton's owner Jeff Cheek, currently resides in Florida and operates a dealership in Missouri. *Id.*, Kulow Decl., Dkt. 27, at ¶ 9. As the current owner of another HDMC dealership in Missouri, Jeff Cheek has regular and ongoing contacts with HDMC in Wisconsin. *Id.*

On balance, this factor weighs in favor of transfer.

5.    <u>Contacts Relating to Plaintiff's Claims in the Chosen Forum</u>

The fifth factor focuses on the contacts between Renton's breach of contract claims and Renton's chosen forum (Washington). In claims for breach of contract, this analysis centers on whether the forum has significant contact with the activities alleged in the complaint. *See*, *Nordquist v. Blackham*, No. C06-5433 FDB 2006 WL 2597931 at *4 (W.D. Wash Sept. 11, 2006). Although Renton's claims are necessarily related to its dealership, which was located in Washington, its claims arise from HDMC's alleged decision to reduce the inventory of new motorcycles to Renton – decisions made by HDMC in Wisconsin. *See* Dkt. 27, Kulow Decl., ¶¶ 5, 7.

On balance, this factor weighs in favor of transfer to Wisconsin.

6.    <u>Differences in Costs of Litigation</u>

When considering the difference in cost between two forums, courts disfavor transferring venue when litigation costs are not significantly reduced. Specifically, "the transfer must be 'to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient.'"

REPORT AND RECOMMENDATION- 28

*Wang v. LB Int'l, No*. C04–2475JLR, 2005 WL 2090672, at *1 (W.D. Wash. Aug. 29, 2005) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 645-46, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)).

According to HDMC's evidence, the cost to Harley-Davidson to defend this lawsuit will be significantly higher in Washington than at its corporate place of business in Milwaukee, Wisconsin, where it can avoid costly witness air travel and hotel arrangements for extended periods of time surrounding depositions, hearings and trial. Dkt. 27, Kulow's Decl., ¶¶ 7, 8. At least 7 persons identified by HDMC as having knowledge of the allocation of motorcycles to HDMC dealers, marketing, dealer development, day-to-day interactions with the Renton dealership, and processing Renton's dealership application and contracts, are located in Wisconsin. Others include 1 person in North Carolina, 1 person in Australia, 1 person in Bend, Oregon, and 2 persons in Washington. In addition, Jeff Cheek, the former owner of Renton, operates another Harley-Davidson dealership in Missouri and currently resides primarily in Florida. *Id.*, ¶ 9.

Renton argues that HDMC's list "ignores all potential witnesses affiliated with Plaintiff, none of which will be located in Wisconsin," but provides no names and no locations of these potential witnesses. Dkt. 29 at 24. Without any supporting evidence, this Court cannot assume these facts.

The witnesses located far from Washington and Wisconsin do not affect the relative costs of litigation in this case because they would need to travel regardless. Removing them from consideration, the court concludes that this factor weighs in favor of transfer because most of the witnesses are in Wisconsin.

//

//

REPORT AND RECOMMENDATION- 29

7.    Availability of Compulsory Process to Compel Unwilling Non-Party Witnesses

The seventh factor relates to the Court's power to compel the attendance of unwilling non-party witnesses. The availability of compulsory process favors transfer only if Wisconsin has the authority to subpoena more non-party witnesses than Washington. *See Ahead, LLC*, No. C13-0187-JLR, 2013 WL 1747765, at *12.

HDMC identifies two known non-party witnesses, who are within the subpoena power of Wisconsin courts and one potential non-party witness, who is within the subpoena power of Washington courts, and several remaining witnesses, who fall outside the subpoena power of both Wisconsin and Washington. Dkt. 27, Kulos Decl., ¶¶ 7-8.

However, because neither party has provided evidence that any of the non-party witnesses would be unwilling to attend, the importance of this factor is eliminated. As this factor is neutral, it does not weigh in favor of transfer.

8.    Ease of Access to Sources of Proof

This factor focuses on access to sources of proof—more specifically the location of "the relevant witnesses and other sources of proof." *Jones*, 211 F.3d 495, 499. Besides witnesses, this analysis focuses on the location of the assets of the sale and documentary evidence. *See Nordquist*, No. C06-5433 FDB, 2006 WL 2597931 (the location of assets of the sale in Texas supported transferring venue to Texas).

According to HDMC's Dealer Development Manager, any HDMC documentation that is likely to be relevant to the allegations of the Complaint and the documentation referenced in the Complaint is held by HDMC in Milwaukee, Wisconsin. These documents include the "pro forma" and other sales proposals, materials reflecting the ongoing performance or sales activity

REPORT AND RECOMMENDATION- 30

of Renton, the handling of motorcycle orders, and application of HDMC's allocation formula. Dkt. 27, Kulow Decl., ¶ 5.

Renton astutely notes that electronic records kept by HDMC related to business all across the United States should be equally accessible in Washington as they are in Wisconsin. Renton also argues that the relevant evidence "in Plaintiff's possession *was* undisputedly maintained in Washington." However, Renton provides no evidence from which this Court can conclude that Renton has any sources of proof still in Washington today and, as previously noted, this Court cannot assume such evidence. This is particularly so as Renton's former owner now lives in Florida and operates a HDMC dealership in Missouri. Thus, this factor weighs in favor of transfer to Wisconsin.

Based upon the evidence submitted on this issue, six of the eight factors weigh in favor of transfer. Accordingly, the undersigned recommends that this Court transfer this matter to the Eastern District of Wisconsin, pursuant to 28 U.S.C. § 1404(a), which is the more appropriate venue.

## CONCLUSION

The undersigned recommends that the Court **deny** HDMC's motion to dismiss (Dkt. 26) as to Counts I, II, and III; **grant** HDMC's motion to dismiss as to Counts IV, V, VI, VII, and VIII; and **grant** HDMC's motion to transfer this matter to the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1404(a).

## OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

REPORT AND RECOMMENDATION- 31

Objections, however, may be filed and served upon all parties no later than **November 15, 2019.** The Clerk should note the matter for **November 18, 2019**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed eleven (11) pages. The failure to timely object may affect the right to appeal.

DATED this 25th day of October, 2019.

BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION- 32